NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 231554-U

NO. 4-23-1554

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 4, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macoupin County |
| DILLARD J. DEHART, | ) | No. 22CF26 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Joshua A. Meyer, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court (1) affirmed defendant's conviction in a jury trial because defendant forfeited his evidentiary claim by failing to raise it in the trial court and (2) remanded for defense counsel to file a certification for a waiver of court assessments.

¶ 2       In August 2023, a jury found defendant, Dillard J. DeHart, guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2022)). In December 2023, the trial court sentenced defendant to 10 years in prison.

¶ 3       Defendant appeals, arguing that (1) the trial court abused its discretion by admitting cell phone extraction reports without a sufficient foundation and (2) defense counsel rendered ineffective assistance by failing to file a waiver of assessments pursuant to Illinois Supreme Court Rule 404(e) (eff. Sept. 1, 2023). The State concedes counsel was ineffective regarding the waiver of assessments issue, and we remand for filing of a Rule 404(e) certification for a waiver of

assessments. We otherwise affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charge

¶ 6        In February 2022, the State charged defendant with one count of criminal sexual assault, a Class 1 felony (720 ILCS 5/11-1.20(a)(3), (b)(1) (West 2022)), alleging defendant "digitally penetrated the vagina" of J.S., a family member under 18 years of age.

¶ 7                                    B. The Jury Trial

¶ 8        In August 2023, the trial court conducted defendant's jury trial.

¶ 9                                    1. *James Stapleton*

¶ 10       James Stapleton testified that he had been employed at the Illinois attorney general's office as a digital forensic examiner since 2020. The State asked Stapleton about the qualifications to be a digital forensics examiner, and he responded, "I've—so prior to that, I worked as a—I was a police officer and a detective, and during that time frame, I obtained certificancy [*sic*] in mobile device forensics, attended classes and conducted actual extractions of mobile phones." Stapelton testified that an "extraction of a mobile phone" is "a forensic method to obtain the data stored on the phone." The data on the phone is not changed when extracted; the data is simply "pull[ed]" from the phone "into the extraction."

¶ 11       Regarding his involvement in the case, Stapleton testified that he never met defendant and did not do "any investigation in this matter whatsoever." He was simply responsible for performing the forensic extractions. Stapleton explained that Detective Lieutenant Ryan Dixon gave him two cell phones, "[a]n Apple iPhone and an Android phone, which was a Samsung phone," with the request to obtain forensic extractions from the devices. Stapleton testified he used "industry approved forensic tools to extract the data from the phones." After the extraction, the

phone data was "put on storage media to provide to Lieutenant Dixon." The State asked, "In any way, shape, or form did you change or modify the data copied from those two phones before you provided it to Lieutenant Dixon?" Stapleton answered, "No."

¶ 12     On cross-examination, defendant asked if Stapleton was looking for metadata on the phones. Stapleton testified that he did not look at any of the phone data but "merely extracted the data from the phone" and "provided Lieutenant Dixon with the extraction." Defendant asked whether Stapleton "extracted the data from the phone itself and not from *** some external device such as an [Secure Digital Memory (SD)] card or [subscriber identity module (Sim)] card." Stapleton answered, "Those are often plugged into the phone, and that's part of the extraction," although he could not say whether "that was the case in the case of these phones." Stapleton testified that the extraction could not reveal who was physically operating the phone at the time when data was created.

¶ 13                    2. *Ryan Dixon*

¶ 14     Detective Lieutenant Ryan Dixon testified that he was employed at the Macoupin County Sheriff's Office, where he had worked for 19 years and served as the evidence custodian. Dixon testified that on February 9, 2022, he was contacted by patrol officers about a sexual assault complaint made by J.S. at her school. J.S. was 15 years old at that time, and she named defendant, who was her great uncle, as the perpetrator. The police contacted the Illinois Department of Children and Family Services (DCFS) to schedule a forensic interview, which took place on February 10 at the Litchfield children's advocacy center. Dixon attended that interview, at which J.S. made a disclosure consistent with her initial complaint.

¶ 15     Dixon testified that on February 15, 2022, he interviewed defendant at the police department. Defendant did not confess to sexually assaulting J.S. Instead, defendant asserted that

J.S. had fabricated the complaint because she was getting in trouble at home for "behavioral issues." Specifically, J.S. had run away and spent one or two nights away from home.

¶ 16　　　　Dixon testified that he believed defendant's statement during the initial interview had some plausibility. Dixon contacted Jane S., J.S.'s grandmother and legal guardian, to schedule a second interview with J.S. due to defendant's statement and Dixon's own suspicions that J.S. had made up the complaint.

¶ 17　　　　On February 21, 2022, Dixon conducted the second J.S. interview with Detective Paul Bouldin, a juvenile officer. Jane sat next to J.S. during the interview, J.S. was Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and Dixon began to question her about details from the accusation, which he testified he did in an "abrasive" or "[s]omewhat accusatory" manner, to assess its validity. At first, J.S. did not recant, but after a few minutes of questioning "without appropriate responses," J.S. looked at Jane, who made a statement. J.S. then recanted, and the interview was concluded shortly thereafter.

¶ 18　　　　A few minutes after Dixon and Bouldin returned to the sheriff's office after the interview, DCFS employee Chancey Parker contacted Dixon by phone and told him that J.S. had sent Parker photographic images of her being sexually assaulted. A short time later, Parker and her supervisor arrived at Dixon's office to provide more context to the photos, and they eventually e-mailed them to him. (We note that although Dixon used the term "photographs," he was actually discussing four short video clips.) Dixon stated he suspected defendant was the person in the photos based on his stature and physical characteristics.

¶ 19　　　　Dixon testified that he, Bouldin, and the DCFS employees went to Jane's residence. When they arrived, defendant and his nephew, Gary J., were in the driveway. Bouldin talked to defendant while Dixon went to the house and spoke with J.S. in her room. Dixon asked J.S. if she

had her cell phone with those pictures. J.S. unlocked her phone and showed it to Dixon, showing him two still images and four small video clips. Dixon explained that the background of the videos was identical to defendant's room, where J.S. said the videos were taken. Dixon testified that defendant later confirmed it was his room during a subsequent interview.

¶ 20    Dixon then returned to the police department, where he and Bouldin conducted a video-recorded interview with defendant, portions of which were played for the jury. Dixon used his work cell phone to show defendant the videos J.S. sent to DCFS. Defendant consistently denied he was the person in the videos. Dixon testified that at one point defendant "made a statement that said: How can you tell that's me? All you can see is the top of my forehead. The word 'my' indicated to me that that was him." Defendant suggested J.S. superimposed his face into the video and questioned how one could tell the body in the video was J.S. because there were no identifying marks. Dixon testified that defendant never admitted that it was he in the video.

¶ 21    Dixon testified that on February 22, 2022, he gave defendant's Android phone and J.S.'s iPhone to Stapleton at the attorney general's office in Springfield, Illinois, "to do cell phone extractions" and received them back on February 25, 2022, along with the extractions. Dixon testified that he had downloaded upwards of 25 cell phone extractions over his career and reviewed the extractions in this case. Dixon stated that on J.S.'s phone, he was able to locate the videos that he was previously shown on February 21. Dixon found the four videos "in her video files" on the iPhone.

¶ 22    The State then sought to introduce the extraction reports that are the subject of this appeal into evidence. The State showed Dixon People's exhibit No. 13, and he identified it as "an extraction report from the Cellebrite system. I took a report and generated a report of those videos from J.S.'s cell phone." Dixon testified he created the report, which was just a printout from the

- 5 -

extraction. Dixon agreed he did not "have to manipulate anything or do anything fancy to get this report," other than simply printing it. The State asked, "And those extractions, did you make sure they correspond with the four video files that you found on J.S.'s phone; is that correct?" and Dixon replied, "That is correct."

¶ 23 At this point, the State moved to introduce People's exhibit No. 13. Defense counsel objected on "foundation" to the admission of this evidence, and the trial court heard arguments from the parties as follows:

"MR. TURPIN [(DEFENSE COUNSEL)]: We would object on foundation, Your Honor.

MR. GARRISON [(THE PROSECUTOR)]: We have perfected chain of custody throughout this matter. We've shown Detective Dixon's knowledge in handling the extraction and he is the one that personally collected it from the phone. No other investigator did this. This is a print-off from data received from the cell phone.

MR. TURPIN: Your Honor, with respect to chain of custody, the expert from the State testified that he got a couple of phones from Mr. Dixon, but he didn't identify the phones. He said one was an iPhone and one was a Samsung. He didn't ID the phones, didn't say what he did with them. There's not been a sufficient chain of custody to show that these phones we're talking about here were the ones that Mr. Stapleton did the extraction on.

MR. GARRISON: Your Honor, he did testify, Mr. Stapleton talked about it was an Apple Phone and an Android phone was the other. We have talked about the Apple phone at this point in time, told the date and time it was given. Even that

being said, Your Honor, minor gaps in chain of custody to [*sic*] not fail for admissibility. So even if his objection is well standing, which it is not, it still would not—sorry his concern was well founded, which it is not, it would not prevent this from being admitted into evidence, Your Honor."

¶ 24 The trial court overruled the objection and admitted the extraction report into evidence. Dixon testified that the corresponding date for the creation or modification of the four video files on J.S.'s phone was February 21, 2022, which was the date Parker sent him the photos.

¶ 25 Dixon testified that "the exact same process" was undertaken for defendant's cell phone and all four videos existed on his phone as well. Dixon stated he reviewed and compared the videos on each phone and they were identical.

¶ 26 Dixon added that the four videos were found in the video file of defendant's phone. The State approached with People's exhibit No. 14, the extraction report generated from defendant's phone. The State moved to admit People's exhibit No. 14, and defense counsel made the "same objection on foundation." The trial court admitted People's exhibit No. 14 over this objection.

¶ 27 Dixon testified that the metadata on defendant's phone, as shown by People's exhibit No. 14, listed a creation date of February 17, 2022, for each of the videos. The metadata also showed that the Snapchat application was used to create the videos.

¶ 28 The State then sought to introduce a flash drive that Dixon testified contained the four videos of the sexual assault that came from J.S.'s cell phone. Defense counsel objected to the foundation, arguing that the State was attempting to use the "silent witness method" to show the admissibility of the videos but had failed to meet the elements. Defendant pointed out that, among other things, the State had not presented "testimony as to how the phone operated, how it took

videos," or who operated the phone. The trial court agreed with defendant and told the State it would need to lay additional foundation for the videos.

¶ 29        Dixon confirmed that the videos were recorded on an Android cell phone in good condition with the ability to record videos on the phone's camera. Dixon confirmed that the videos occurred in defendant's bedroom, as he admitted "during the investigation" and "during the interview that this was indeed his bedroom." Dixon stated that J.S. used Snapchat and that he thought J.S. was "a competent operator" of the Android cell phone. The State moved to admit the four videos, and the trial court admitted them over defendant's objection. All four videos were then played for the jury.

¶ 30        On cross-examination, Dixon acknowledged that the dates and times on the extraction reports were obtained from the phone's internal clock and if that internal clock were inaccurate, the dates and times would also be inaccurate. Dixon testified he was trained to do extractions and one of the things he was trained to do was to put cell phones in airplane mode when obtained to prevent the phones from getting additional information from cell towers or Wi-Fi. Dixon stated he followed that protocol with both phones in this case.

¶ 31        Defendant then asked how Dixon prepared the extraction reports, and Dixon responded as follows:

> "A. In the system, when they provide us an extraction, it comes in a software package that parcels out different portions of the data. So when I look at it, you'll see basically a bunch of icons on a page that will indicate that this is a file containing whatever the contents are. So it may say text messages or chats. It may say videos, it may say pictures. So you go into that system and there is a way to do it that literally says export and then has a drop-down menu and ask[s] you what you

want to import.

Q. So you can actually be in control of what gets put onto an extraction report, correct?

A. That is correct.

Q. So you can omit whatever is on there that you don't need to look at[,] right?

A. That is correct.

Q. And that's what you did in preparing this extraction report for coming to court today, correct?

A. I just took the—the—what I provided the State. That is correct."

¶ 32    Defendant then asked about the interview Dixon conducted of J.S. on February 21, 2022. Dixon again testified that he Mirandized J.S. and questioned her "abrasive[ly]." J.S. then recanted her earlier allegation of sexual assault.

¶ 33    Dixon testified that he had no knowledge that J.S. was being forced to recant. Dixon agreed that the interview started at about 10 a.m. and ended at 10:22 a.m. About 20 minutes later, Dixon received a call from DCFS about the accusation against defendant for which he was currently on trial. Dixon agreed that J.S. never mentioned anything about the sexual assault that allegedly occurred on February 17, 2022, four days before the second interview, despite having "the perfect opportunity."

¶ 34    On redirect examination, Dixon testified that defendant had his cell phone on February 21, 2022, and J.S. would not have been able to manipulate the time on the phone that day. Dixon explained that he selected only the four videos because they were the only ones that were relevant out of the 36,000 pictures and 400 videos he found and reviewed on the phone.

¶ 35                                      3. *Kim S.*

¶ 36          Kim S. testified that J.S. was her daughter. Kim lost custody of J.S. in 2011, and Jane S. had custody of J.S. Kim knew defendant through J.S. because he was J.S.'s great uncle, but Kim was not related to him. Kim testified that between December 2021 and February 2022, she did not have any contact with defendant. Kim also testified that she had never had any sort of sexual contact with defendant and had never recorded herself performing a sexual act with defendant. Kim stated she dyed her hair, which was currently brown, but her natural hair color was blonde.

¶ 37          On cross-examination, Kim testified that she lived with defendant and J.S. "for a short while" , about six months "[i]f that," in Missouri. Kim acknowledged that she was charged with felony possession of a controlled substance in Missouri in 2019 and 2020. She pleaded guilty to both offenses and received probation.

¶ 38          Defendant questioned Kim on whether she had traveled to the Illinois home where J.S. lived with Jane and defendant:

          "Q. And is it not true that in February of '22 when all this began with [J.S.] and her reports of what [defendant] was allegedly doing that you actually came up here to Staunton[, Illinois] to take her home?

          A. No.

          Q. You're saying you never came to Staunton?

          A. I've never been to Staunton, no.

          Q. And [J.S.] didn't call you to come and pick her up?

          A. No, sir. Never.

          Q. Now, obviously, you know Jane [S.,] who would be your daughter's

grandmother, correct?

A. Yes.

Q. And she lives in Staunton?

A. Uh-huh.

Q. And you don't get along particularly well with her, correct?

A. No.

Q. And you certainly wouldn't want her to know that you had been at her house, correct?

A. I mean, if I—every time I see my daughter I made sure that Jane knew I was there.

Q. All right. But you wouldn't want her to know that you came there without her permission, correct?

A. She always knew.

Q. So you have been to her house in Staunton?

A. No. Never in Illinois. Only in Missouri."

¶ 39　　　　　On redirect examination, Kim again testified that she had never been to Staunton. Further, Kim did not have a driver's license and had not had one since 2008 or 2009. Kim stated she currently lived in Missouri "right on the line." She denied that she could drive herself to the state of Illinois.

¶ 40　　　　　On recross-examination, defendant asked, "Now, are you saying that you've never been to Staunton, Illinois?" Kim responded, "Only to—right now."

¶ 41　　　　　　　　　　　　　　　　4. *J.S.*

¶ 42　　　　　J.S. testified she was 16 years old at the time of trial and had lived with Jane for

- 11 -

most of her life. In December 2021, Jane and J.S. moved from Missouri to a three-bedroom house in Illinois. Defendant, who had lived with them in Missouri, also moved into the house, and each person had a separate bedroom.

¶ 43 J.S. testified that in February 2022, she ran away from home because defendant was sexually assaulting her. J.S. told the school about the assault, and DCFS got involved. J.S. was interviewed on video by a female law enforcement officer and examined at the hospital. J.S. was removed from her grandmother's house for a week.

¶ 44 When J.S. returned home after school on February 17, 2022, Jane was sitting on the couch talking on the phone. J.S. needed help with her math homework and asked Jane. Jane told J.S. to have defendant help her, so J.S. went to defendant's room with her math homework. J.S. testified she did not have her own phone because Jane had taken it away from her as punishment for her running away. Because J.S. had not received her phone back yet, she was using defendant's smartphone as a calculator. J.S. sat on defendant's bed to do her homework.

¶ 45 Defendant was already in the room. J.S. testified that defendant "slammed [her] on the bed," removed her pants, digitally penetrated her, and licked her vagina. Defendant told J.S. to be quiet, while Jane sat in the next room. J.S. held defendant's phone to her chest and used Snapchat to record four short videos of the assault. She took short videos so defendant would not catch her taking the videos. She knew defendant's phone password because she "used his phone regularly."

¶ 46 J.S. sent the videos to her phone via Snapchat so she could send them to DCFS. J.S. did not think that DCFS believed her at that time. J.S. confirmed that DCFS had just "returned [her] to the home with [defendant] in it." She wanted to send the videos to DCFS "so they would believe me."

¶ 47 The State showed J.S. a flash drive and asked if she recognized it. J.S. testified that she had initialed the flash drive that morning after viewing the videos on it. Those videos were the same videos she had taken, and the two people in them were herself and defendant.

¶ 48 On February 21, 2022, before she had received her phone back, J.S. was interviewed by law enforcement and told them the assault did not happen because she was afraid of being taken from her grandmother. J.S. testified that although she denied her earlier allegations at that point, the assault did in fact happen.

¶ 49 After the interview, J.S. testified that she went back to the house and asked Jane for her phone back. Jane gave her the phone back, and J.S. sent the videos to DCFS.

¶ 50 J.S. testified that she was 15 years old in February 2022 and defendant was in his sixties. She also testified that the black pubic hair in the video was the color of her pubic hair. J.S. identified defendant in court as the man who assaulted her.

¶ 51 The State concluded its direct examination by asking J.S. whether Kim ever came to Jane's house. J.S. denied her mother had ever come and explained that Kim was not allowed to visit. J.S. talked to Kim only on her phone and never in person.

¶ 52 On cross-examination, J.S. testified that she stayed with her cousin, Gary J., during the week she was removed from her grandmother's house.

¶ 53 The defense then cross-examined J.S. on the events of February 17, 2022. J.S. acknowledged that during the assault, Jane was on the couch not far from defendant's bedroom, which did not have a door. She also confirmed that defendant "slammed" her on the bed and sexually assaulted her. J.S. agreed "[t]hat *** caused quite a commotion" and she was very scared, but she did not yell, scream, or cry out because "[h]e told me to be quiet."

¶ 54 J.S. agreed that "whatever is going on in the living room," such as television or

talking, could be "pretty well" heard from defendant's room. J.S. testified again that instead of crying out, she took videos of the assault with defendant's phone while her grandmother was a few feet away.

¶ 55    J.S. agreed that she had access to defendant's phone, knew his password, and knew how to use his phone to "put things on his phone" and "send things" from his phone to her phone. J.S. acknowledged (1) she could have sent anything on defendant's phone to herself, no matter how old it was, and (2) the fact that she sent something to herself from defendant's phone did not mean that was the same day it first got on his phone.

¶ 56    The defense questioned J.S. about her previous accusation against defendant, reported on February 9, 2022, that resulted in her being removed from Jane's house for a week. J.S. testified that the date of the earlier assault was "[p]robably" February 7, 2022. J.S. denied calling Kim during that week and asking Kim to come get her in Illinois. J.S. agreed that the story she told about the first accusation was not true.

¶ 57    J.S. testified she did not like defendant's living with her and Jane, and she acknowledged that one way of getting a person out of a home is "to tell the police that they hurt you."

¶ 58    J.S. acknowledged that she did not inform the police about the February 17 assault during her February 21 interview. J.S. confirmed that 20 minutes after she left the police station, she contacted DCFS. The defense asked J.S. if she simply "turned around and came up with another accusation," to which J.S. responded, "No."

¶ 59    On redirect examination, J.S. testified that even though she recanted, she was in fact assaulted by defendant on February 7. J.S. said she recanted in that second interview because she was scared.

¶ 60        J.S. testified that the videos were recorded "[t]he second time," meaning "[d]uring the second sexual assault." J.S. agreed that she did not "have these [videos] stored someplace of [defendant] having sex with somebody else and put them on [her] phone."

¶ 61        Last, J.S. explained that she wanted defendant out of the house because she was scared of him. J.S. testified she was scared of defendant because he "does things to [her]" and sexually assaulted her.

¶ 62                            5. *Defendant's Testimony*

¶ 63        Defendant testified that he was 66 years old, lived in Staunton, and was a retired carpenter collecting disability. He moved to Staunton in December 2021 with Jane and J.S., with whom he had been living in Missouri.

¶ 64        Defendant testified that J.S. was his grandniece. J.S. was raised by Jane, and defendant was around her "[o]n and off" when she was a child. Kim S. lived with defendant for six months in 2018 in Chaffee, Missouri. Defendant explained that Kim lived with him because she was on drugs and wanted to get off of them so she could have visitation with J.S. While Kim was living with defendant, they had sex on a few occasions, but they were never in a relationship.

¶ 65        Defendant testified about the house and explained that you could hear the television or someone talking from any of the rooms. While living there, J.S. had her own phone that was on Jane's account. Defendant had his own phone, but it was on his nephew, Gary J.'s account. Defendant stated that J.S. used his phone "all the time" because his phone had a strong signal and hers never did. As a result, J.S. was constantly "putting things on [his phone] that [he] didn't give her permission to do," and he "was always having to have [his] nephew take stuff off of it and that." Defendant further testified that J.S. changed his password "[a]ll the time," frequently locking defendant out of his phone. Defendant said he "would have to call Gary and have him get me a

new password put on it and that. I know nothing about phones."

¶ 66    Defendant stated he was interviewed by the police about J.S.'s first accusation on February 16, 2022. Defendant denied that it occurred, agreed to DNA testing, and told the police that "she was trying to basically take the spotlight off of her because she ran away." Defendant explained that J.S. did not come home after school on Tuesday and he had tried to reach her on her phone. Throughout the evening, J.S. texted where she was and gave various reasons why she could not come home, while still saying she would be home later that night. J.S. never came home that night, however. Defendant suggested that Jane call the police, but she declined to do so.

¶ 67    The next day, Jane got a call from the school, and when she arrived, the police informed her that J.S. had made an allegation of rape against defendant. Jane came home and relayed the information to defendant, saying she had to go to Springfield with J.S. and get a "rape test made." J.S. spent the next seven days with Gary.

¶ 68    Defendant testified that he was told on February 15, 2022, that J.S. had recanted her story. When asked what date J.S. came home from Gary's house, defendant answered, "I know it was a Wednesday. She had half day of school because of the ice storm. She came in there saying it was the 17th, I would agree with that, it was around the 17th."

¶ 69    Defendant stated that Gary came and spoke to him the morning of J.S.'s return and said DCFS wanted to know if defendant could move out because "they were afraid that [J.S.] would try it again." J.S. came home and apologized to defendant, who told her he was going to move out when he got his next check because she did not want him there and he "[couldn't] do this anymore."

¶ 70    Defendant was asked what J.S. was like when she did not get her way, and defendant answered, "She's a very violent and vindictive person, very." According to defendant,

J.S. would tear up the house, kick holes in the walls, kick doors in, and "take it out on her animals."

¶ 71 Regarding February 17, 2022, defendant denied that he digitally penetrated J.S. or licked her vagina. He insisted, "I've never inappropriately touched [J.S.]" at any time. Defendant stated he remembered February 17 "very well" and explained why, as follows:

"Well, like I said, that me and [J.S.] had had this talk, and I told her that I was moving out ***. And like I said, she asked to borrow my phone so she could call her new boyfriend and call her mom. And I said I didn't have a problem with that. And she sat right there and called her mom. And I said hi to Kim over the phone. And because she had her—she calls her mom, it's on a computer I guess is what it is, a big screen and that, and they talk. And I said hi to her. And then it wasn't long after that, that I dozed off."

¶ 72 When asked who the people were in the videos from his phone, defendant testified, "That's me, and it has to be Kim and that, because Kim is the only person I've had any sexual contact with in the past four years." Defendant then explained that on the Wednesday morning after J.S. did not come home, Jane woke defendant up and told him that she had to go to the school "and what she had to go up there for." Defendant went back to sleep, and the "next thing [he] knew," Kim was outside his bedroom window asking to be let inside.

¶ 73 Kim came into defendant's room and explained that J.S. had called her the night before and asked her to come pick her up because she was running away from home. Kim then said that J.S. had "left her stranded because she was supposed to give her gas money to get back home and she didn't."

¶ 74 Defendant told Kim that she could not stay because if Jane came home, Kim would be in a lot of trouble. Kim asked for gas money, and defendant told her it was not his fault she was

stranded. Defendant testified, "And then Kim goes—what she usually does, offer sex if I'd give her the money to get back home." Defendant said they tried to have sex, but because he could not get an erection, "it didn't go any farther than foreplay." Defendant did not know Kim was taking a video, but his phone had been on the nightstand next to the bed and no one else was at home.

¶ 75 Defendant testified that on February 21, 2022, he spoke with Boudin and Dixon at the police station. According to defendant, the officers said they were on defendant's side during the first allegation because they could tell she was not being honest, but now they had evidence. Defendant asked what the evidence was, and they showed him the video. Defendant testified, as follows:

> "I said: It's not me, not with [J.S.] That's not me. And they kept saying: Well, this is your face. And then they'd show me the video. And I said: That's not me and that and they kept saying, basically, well, who else would you have sex with besides [J.S.] in your room and that. I said: Nobody. That's not me. They wanted me to say that that was me with [J.S.] And I wasn't going to say it."

Defendant explained that he refused to say it because it was not true.

¶ 76 Defendant said the interview was the first time he saw the videos and they baffled him because he did not know where they could have come from. Defendant continued, "And like I said, they had to have been Kim because, like I said, for four years, outside of Kim, she's the only contact I've had with a female." At the time, defendant did not know Kim had taken the videos, but when he saw that it was most likely his face in the video, he "knew that's the other person that it could be." Defendant did not tell the police at the time because he "just assumed that it was another time that [J.S.] had said I did something and she was going to say that it wasn't true. And I did not want my sister to know that Kim had been in that house with me."

¶ 77     Defendant stated he thought he would be in trouble if Jane found out, and he explained, "If you knew the relationship between my sister and Kim, you would understand why I didn't say at that time." When asked why he did not think it was necessary to mention it, defendant again said he thought it was another allegation J.S. would recant.

¶ 78     On cross-examination, defendant acknowledged that he had an Android phone and J.S. changed the passcode on it several times. The State asked if Gary came over to reset the password for defendant, and defendant responded that Gary "would basically do it on his phone." Defendant said Gary would give him another password to put on his phone to unlock it. Defendant said Gary could do this remotely because he was a hacker.

¶ 79     The State asked if Gary "hacks into your phone every time that she does this." Defendant answered, "My phone, [J.S.]'s phone, my sister's phone." Defendant twice agreed that he always had a passcode on his phone. He also agreed that he had one on his phone when he gave it to the police and that he gave his passcode to the police.

¶ 80     Defendant testified that he did not speak with Kim very often and he never shared his passcode to his phone with her. When asked whether Kim "randomly knew the passcode to your phone to open it up to take videos," defendant responded, "[J.S.] knew the password." The State asked if defendant was testifying that J.S. sent Kim the passcode, and defendant said he "couldn't say how she got it."

¶ 81     Defendant agreed that Kim came to the house on the same day J.S. "went up to have this rape kit done." He further agreed that Kim knew the passcode, secretly grabbed his phone off the nightstand, and enticed defendant into having sexual relations that she secretly recorded. The following exchange occurred:

"Q. Then [Kim] sent those videos to *** J.S; is that correct?

- 19 -

A. I don't know.

Q. Okay.

A. [J.S.] said she sent them.

Q. So this was a large scheme to entrap you into a sex assault trial; is that correct?

A. I wouldn't say that.

Q. Well, if—it was premeditated because [J.S.] gave the passcode to Kim, then it would be a scheme; wouldn't it?

A. I'm not saying [J.S.] gave her the passcode.

Q. She just had the passcode somehow?

A. I said [J.S.] knew the passcode.

Q. Do you have any reason Kim would have your passcode?

A. No.

Q. So it's highly unlikely she knew the passcode; is that correct?

A. Highly.

Q. So it's impossible for her to access that phone without the passcode; is that correct?

A. Yes. Yes."

¶ 82    Defendant acknowledged that he told the police it had been four years since he had sex with anyone and he never told law enforcement he had sex with Kim. Defendant agreed that Dixon asked him "point blank" who else defendant could have digitally penetrated in his bedroom and defendant said he did not do that to anyone in his bedroom. Asked why he lied, defendant testified that he saw no reason at the time "to say anything" because he assumed J.S. would recant

in a few days, as she did with the original allegation.

¶ 83    Defendant acknowledged he knew it was him in the images the police showed to him, but he continued to lie. Defendant said he told Gary the same day defendant was arrested that "it wasn't [J.S.] in the video, that it was Kim, and for him not to say anything to my sister." Defendant acknowledged that he was willing to tell some other people the truth but was not willing to tell law enforcement to get himself out of jail.

¶ 84    The State closed its cross-examination by confirming that defendant's testimony was that Kim came to the house, enticed him into having sex, secretly used his password-protected phone to record it, and J.S. somehow found out about it and sent them to herself, all to set defendant up for further sexual assault charges. Defendant agreed that was his testimony and that J.S. recanted her prior statement to the police on February 21. The State then asked the following:

"Q. And then after recanting, after this big clandestine plan to frame you, she went back to her house and then made the allegation; is that correct?

A. Yes.

Q. Does that seem plausible, sir?

A. Yes. With [J.S.], yes, it does.

Q. She's a criminal mastermind; huh?

A. No, she is not.

Q. Then why is it so plausible?

A. Because that's just [J.S.] She's very vindictive."

¶ 85    On redirect examination, defendant testified that his phone was in Gary's name and because defendant did not know how to reset the password, it was easier to let Gary do it for him. Defendant admitted he lied to the police about him not being in the videos, but defendant testified

he told the truth that he never molested or assaulted J.S.

¶ 86                              6. *The Jury's Verdict*

¶ 87          Following defendant's testimony, the jury deliberated and found defendant guilty of criminal sexual assault.

¶ 88                    C. Defendant's Posttrial Motion and Sentencing

¶ 89          In September 2023, defendant filed a motion for a new trial, alleging, relevant to this appeal, that the trial court erred by "admitting into evidence a cellular telephone extraction report, admitted as People's Exhibit 13, without a proper foundation."

¶ 90          Later that month, the trial court conducted a hearing on defendant's motion, at which defendant amended his motion to also allege that People's exhibit No. 14 was admitted without a proper foundation. Defense counsel, relying on *People v. Price*, 2021 IL App (4th) 190043, argued that the State failed to provide expert testimony about "how the Cellebrite software works, how to check it for reliability, how [it is] calibrated, [or] how it's checked for accuracy." The State responded that it "just had to show that it was in working order, that it was copied and that it was authenticated," which was done through Dixon.

¶ 91          Following argument, the trial court took the matter under advisement and, later that same month, entered a written order denying defendant's motion.

¶ 92          In December 2023, the trial court sentenced defendant to 10 years in prison.

¶ 93          This appeal followed.

¶ 94                              II. ANALYSIS

¶ 95          Defendant appeals, arguing that (1) the trial court abused its discretion by admitting the cell phone extraction reports without a sufficient foundation and (2) defense counsel rendered ineffective assistance by failing to file a certificate for a waiver of assessments pursuant to Illinois

- 22 -

Supreme Court Rule 404(e) (eff. Sept. 1, 2023). The State concedes counsel was ineffective, and we remand for filing of a Rule 404(e) certification for a waiver of assessments. We otherwise affirm the trial court's judgment.

¶ 96                    A. Foundation for the Extraction Reports

¶ 97        Defendant first argues that the State failed to lay an adequate foundation for People's exhibit Nos. 13 and 14, which were extraction reports showing the metadata for the videos located on defendant's and J.S.'s phones. Specifically, defendant asserts that the State never presented any testimony about (1) the Cellebrite software used to generate the reports and how it works, (2) how Cellebrite is calibrated or validated, and (3) whether Cellebrite was working and operated properly when the extraction reports were made. In short, defendant contends the admission of the reports was error because the State did not present any testimony to demonstrate that the reports were accurately produced from the phones' data.

¶ 98        The State responds that defendant forfeited his objection to the foundation for the accuracy of the reports by failing to make it in the trial court. The State notes that when defendant argued his foundation objection at trial, he asserted only that the State had failed to demonstrate an adequate chain of custody to show that the phones recovered were the same ones examined. Defendant first raised his arguments about the lack of foundation for Cellebrite and the reports' accuracy in his posttrial motion, which was too late because the State did not have a chance to address the issue and cure any shortcomings during trial. The State further argues that defendant cannot prevail under the plain-error doctrine because the evidence was not closely balanced.

¶ 99        Defendant replies that he clearly objected to the reports' foundation at trial, properly preserving the issue for review. In the alternative, defendant contends that the evidence was closely balanced.

- 23 -

¶ 100    We agree with the State.

¶ 101            1. *Forfeiture of Evidentiary Objections*

¶ 102               a. The Applicable Law

¶ 103    "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The failure to do either results in forfeiture. *Id.* Application of the forfeiture rule "is particularly appropriate when a defendant argues that the State failed to lay the proper technical foundation for the admission of evidence, and a defendant's lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof at the trial level." *Id.* See *People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7 ("[A]n objection requirement is especially important in cases of an improper foundation because errors in laying a foundation are easily cured.").

¶ 104    To preserve an issue for appeal, "an objection must specifically identify the grounds for the objection[,] and *** boilerplate language cannot be used as a catch-all to preserve issues for appeal." *People v. Hauck*, 2022 IL App (2d) 191111, ¶ 33; see *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 53 ("Unless they are obvious from the record, the grounds for an objection must be specifically stated in order to preserve an issue for appeal."). "General objections which do not inform the trial court of the basis for the claims of error made on appeal do not preserve the unspecified claims for review." *People v. Bock*, 357 Ill. App. 3d 160, 170 (2005) (citing *People v. Williams*, 165 Ill. 2d 51, 60-61 (1995)); see *People v. Bair*, 379 Ill. App. 3d 51, 57 (2008) ("The defendant's general objection of 'foundation' was not sufficiently specific to preserve the issue for review."); see also *People v. Reichert*, 2023 IL App (5th) 180537, ¶¶ 116-17 (concluding that the general objection to an officer's testimony "as a whole" did not include the

more specific objections of relevance and unfair prejudice he raised on appeal and were therefore forfeited).

¶ 105    "[A] specific objection to the admission of evidence waives all grounds not specified." *People v. Lewis*, 165 Ill. 2d 305, 335 (1995); *People v. Lovejoy*, 235 Ill. 2d 97, 148 (2009). "On review, a defendant cannot change or add to the basis for his objection." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 44. Of course, "[a]n issue raised by a litigant on appeal does not have to be identical to the objection raised at trial," and a reviewing court will not deem a claim forfeited "when it is clear that the trial court had the opportunity to review the same essential claim." *Lovejoy*, 235 Ill. 2d at 148. "However, where '[t]he claim defendant raises on appeal is significantly different from the claim he raised below,' the issue raised on appeal is forfeited." *People v. Scott*, 2015 IL App (4th) 130222, ¶ 30 (quoting *Lovejoy*, 235 Ill. 2d at 148). "We will not impute error to a trial court for failure to consider a theory not fairly presented. The trial court does not have a duty to consider all possible theories; rather, its task is to rule on the basis of the theories presented." *People v. Hamilton*, 283 Ill. App. 3d 854, 861 (1996), *rev'd on other grounds*, 179 Ill. 2d 319 (1997).

¶ 106                              b. This Case

¶ 107    In the present case, when the State moved to admit exhibit No. 13 at trial, defense counsel stated, "We would object on foundation, Your Honor," and offered no further specificity at that time. The State responded to the objection by addressing multiple aspects of the foundation for the first extraction report. In particular, the State argued that it had (1) "perfected chain of custody throughout this matter," (2) "shown Detective Dixon's knowledge in handling the extraction," and (3) demonstrated that Dixon, and no other investigator, "personally collected it from the phone." The State concluded by saying, "This [report] is a print-off from data received

from the cell phone."

¶ 108    Defense counsel then argued as follows:

> "Your Honor, with respect to chain of custody, the expert from the State testified that he got a couple of phones from Mr. Dixon, but he didn't identify the phones. He said one was an iPhone and one was a Samsung. He didn't ID the phones, didn't say what he did with them. There's not been a sufficient chain of custody to show that these phones we're talking about here were the ones that Mr. Stapleton did the extraction on."

Thereafter, the State asserted it had established a sufficient foundation, and the trial court overruled the objection.

¶ 109    As the exchange shows, the trial court had no reason to think that defendant's foundation objection was premised on anything other than the chain of custody for the phones. In this very case, the State responded to multiple different elements of the foundation for exhibit No. 13, including (1) chain of custody, (2) knowledge of how to handle the extraction, (3) personal knowledge of the creation of the report, and (4) the identity of the contents of the report itself. Defense counsel could have easily challenged the accuracy of the software or Dixon's knowledge of how it worked and whether it was working properly. Indeed, counsel did exactly that just a short time later when the State attempted to admit the videos under the silent witness theory; the court agreed with defense counsel and required the State to provide an additional foundation prior to their admission.

¶ 110    Instead, defense counsel focused on the chain of custody to the exclusion of all the other grounds raised by (1) the vague foundation objection and (2) the State's response addressing several different elements of the foundation for exhibit No. 13. An objection on a particular ground

waives all other grounds not specified. *Lewis*, 165 Ill. 2d at 335. This is particularly true with respect to foundation objections because they can be easily cured and the failure to be specific deprives the State of the opportunity to remedy the objection. *Korzenewski*, 2012 IL App (4th) 101026, ¶ 7. Counsel knew what he was doing because later in Dixon's testimony, he did object based on the lack of accuracy of the videos and whether the equipment was working properly, and the State was able to provide that foundation to the trial court's satisfaction.

¶ 111　　　　We will not excuse counsel's clear choice to object solely to the chain of custody by reading entirely distinct arguments he was perfectly aware of into his response. Doing so would be fundamentally unfair to the State, which was deprived of the opportunity to either recall Stapleton as its expert or ask Dixon to explain, based on the training he testified he had, how he knew the reports were accurately produced by the software and extraction data.

¶ 112　　　　Essentially, defendant is asking this court to reverse the trial court's ruling regarding the admissibility of evidence based upon an argument the trial court never heard. This court is always very reluctant to do that. See *People v. Kuehner*, 2022 IL App (4th) 200325, ¶ 132. Accordingly, we conclude that defendant forfeited the arguments he raises on appeal regarding lack of foundation because he failed to assert them in the trial court.

¶ 113　　　　　　　　　　　　　　2. *Plain Error*

¶ 114　　　　　　　　　　　　a. The Applicable Law

¶ 115　　　　A reviewing court may consider a forfeited error under the plain-error doctrine when a clear or obvious error occurred and (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People*

*v. Moon*, 2022 IL 125959, ¶ 21.

¶ 116 "To determine whether the evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53). Typically, the evidence is closely balanced when "the outcome of th[e] case turned on how the finder of fact resolved a 'contest of credibility.' " *Sebby*, 2017 IL 119445, ¶ 63 (quoting *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008)). A "contest of credibility" exists when (1) both sides presented a plausible version of events and (2) there is no extrinsic evidence to corroborate or contradict either version. *Id.* ¶¶ 60-63. "The defendant bears the burden of establishing plain error." *People v. Kitch*, 239 Ill. 2d 452, 461 (2011).

¶ 117                                    b. This Case

¶ 118 Defendant claims that the evidence in this case was closely balanced because, in the absence of the extraction reports, the case boils down to a simple credibility contest between J.S and defendant. That is to say, if the extraction reports, which corroborate J.S.'s testimony, had not been admitted, the jury would have to weigh only J.S.'s word against defendant's word, each of whom admitted that they had lied to the police. However, defendant's argument ignores (1) the other evidence in the case supporting J.S.'s version of events and (2) the inherent implausibility of his own version of events.

¶ 119 On appeal, defendant only challenges the admission of People's exhibit Nos. 13 and 14, the extraction reports, for improper foundation. Although the defense objected at trial, he does not challenge on appeal the foundation for the four video files. The videos themselves are by far the strongest corroboration of J.S.'s testimony.

¶ 120 At trial, defendant admitted he was the male shown in the videos, but he claimed the female torso shown was Kim, not J.S. J.S. testified that she was the female in the videos, she took the video, and that her pubic hair was black, matching the video.

¶ 121 Kim testified she never had sexual relations with defendant and never recorded them having sexual relations. Her natural hair color was blonde.

¶ 122 In its closing argument, the State pointed out to the jury that "it is clear that it's a minor child's torso in that video, not a full-grown woman." The videos are literally full-color recordings of the crime being committed.

¶ 123 If the videos did not exist, the State would have had very little evidence to disprove defendant's theory that he never assaulted J.S. However, the videos are a perfect match for J.S.'s version of events, thereby offering very strong independent corroboration of her testimony. Accordingly, even without the extraction reports showing when the videos were made and sent, this case does not amount to a pure credibility contest.

¶ 124 In addition, we note that all of the testimony at trial, including most of defendant's testimony, established a consistent timeline of events. J.S. did not come home the night of February 8, 2022, and told the school, DCFS, and the police about the sexual assault the next day. Jane and J.S. were gone all day speaking with authorities and going to get a medical examination. J.S. spent the next week with Gary and returned to Jane's home on February 16, 2022. On February 17, she took the bus home after school and began doing homework. She needed help with her math homework because Jane had taken her phone away from her as punishment for running away, and Jane told her to get help from defendant.

¶ 125 J.S. testified that she sent the videos to herself because she did not have a phone and wanted to send the videos to DCFS. Immediately after recanting during her second police

interview, she asked for her phone back, received it, and sent the videos to DCFS. Dixon testified that about 20 minutes after the interview concluded, he was contacted by DCFS and alerted that J.S. had sent photographic proof of a sexual assault. He eventually received the videos by e-mail, saw them on J.S.'s phone later that day, and subsequently located them on the extractions of both phones.

¶ 126    Although J.S. recanted her first allegations against defendant, she had a consistent explanation for doing so, and the other testimony in the case strongly supported her timeline of events. J.S. had told the school, DCFS, and the police that defendant had sexually assaulted her; however, she was returned to the home while defendant was still living there. During the second interview, the police treated her like a suspect, Mirandizing her prior to starting the interview and asking questions in an abrasive and accusatory manner. J.S. refused to recant until Jane said something to her. J.S. testified she recanted because she was scared of being removed from Jane's care again.

¶ 127    Defendant faulted J.S. for not sharing any of the new allegations or telling the police that she possessed video proof despite having the perfect opportunity to do so. However, J.S. did not have her phone with her during the first interview, and the police had accused her of lying. As the State argued in closing arguments, J.S.'s telling only DCFS bespeaks of her going to the lone agency that had helped her and contradicts any suggestion that J.S. was part of a plot to frame defendant for criminal sexual assault.

¶ 128    Defendant's story was inherently implausible. Defendant admitted that he always had his phone password-protected and Kim had no way of knowing what the password was. Although he repeatedly mentioned that J.S. knew his password (and J.S. testified to the same), defendant did not claim that J.S. gave the password to Kim. Defendant asserted that Kim showed

up on the morning of February 9, 2022, while Jane was at the school learning about J.S.'s accusations. She was by herself, claimed she had come because J.S. asked to be picked up, and was now stranded without money for gas. Kim supposedly offered to have sex in exchange for gas money, picked up defendant's phone from the nightstand, unlocked the phone, and secretly recorded them having sex but did not send the videos to anyone, apparently planting them for J.S. to handle later.

¶ 129    However, Kim testified that she had never had sexual relations of any kind with defendant. She had not had a driver's license since 2008 and had no way of getting to Illinois. Kim stated she had never been to Jane's house in Illinois and had never been to Staunton, except for the day of trial. We take judicial notice of the fact that the Macoupin County Courthouse is located in Carlinville, not Staunton, suggesting that Kim did not know where Staunton actually was. J.S. also denied that Kim had ever come to Staunton or Jane's house.

¶ 130    Given all of this context, the evidence of defendant's guilt was not closely balanced.

¶ 131    B. Counsel's Failure To File a Certificate for a Waiver of Assessments

¶ 132    Finally, defendant asserts that defense counsel rendered ineffective assistance by failing to file a certificate for a waiver of assessments pursuant to Illinois Supreme Court Rule 404(e) (eff. Sept. 1, 2023). The State concedes counsel was ineffective, and we accept the State's concession. Accordingly, we remand for the filing of a Rule 404(e) certification for a waiver of assessments.

¶ 133                                III. CONCLUSION

¶ 134    For the reasons stated, we affirm the trial court's judgment and remand for the filing of a Rule 404(e) certification for a waiver of assessments.

¶ 135    Affirmed and remanded.