NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250056-U

NO. 4-25-0056

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| JOSEPH CIANCIO-FUCHS, | ) | No. 23CF1960 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held*:   In his claim that he received ineffective assistance from defense counsel,
defendant failed to show that the allegedly deficient performance caused prejudice
to the defense, and without a showing of prejudice, the claim fails.

¶ 2     At the conclusion of a bench trial, the circuit court of Winnebago County found

defendant, Joseph Ciancio-Fuchs, guilty of three counts of predatory criminal sexual assault of a

child (720 ILCS 5/11-1.40(a)(1) (West 2020)). For those offenses, the court sentenced him to

three terms of natural life imprisonment.

¶ 3     Defendant appeals. The grounds of his appeal can be boiled down to a contention

that defense counsel rendered ineffective assistance at trial, mainly by failing to make hearsay

objections to out-of-court statements by the two victims, A.L.O. and A.M.O. (whom we will call,

collectively, the children). We are unconvinced that the lack of hearsay objections at trial caused

prejudice to the defense. Therefore, we affirm the circuit court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Charges

¶ 6            The indictment alleged that, in Winnebago County, during the period of October

1, 2020, to December 31, 2021, defendant committed three offenses of predatory criminal sexual

assault of a child (*id.*). At the time of those offenses, defendant was 17 years of age or older,

according to the indictment, and his touching of the children was "for purposes of sexual

gratification or arousal of the victim or the accused."

¶ 7            Count I alleged that, with his hand, defendant touched the sex organ of A.M.O,

who was born in November 2013.

¶ 8            Count II alleged contact between defendant's mouth and A.M.O.'s sex organ.

¶ 9            Count III alleged that, with his hand, defendant touched the sex organ of A.L.O.,

who was born in July 2015.

¶ 10                          B. The Proceedings Under Section 115-10

¶ 11                          1. *The State's Notice of Intent to Offer Prior Statements*

¶ 12           Pursuant to section 115-10(d) of the Code of Criminal Procedure of 1963 (Code)

(725 ILCS 5/115-10(d) (West 2024)), the State filed a notice that it intended to offer into

evidence, at trial, some out-of-court statements the children had made regarding sexual acts

perpetrated upon them by defendant. The State proposed that, at trial, it would introduce those

statements through the testimony of a forensic interviewer, Joanna Deuth; a nurse practitioner,

Heather Sharp; and the children's mother, Andria O.

¶ 13                          2. *Testimony at the Hearing Pursuant to Section 115-10(b)(1)*

¶ 14           On July 1, 2024, the circuit court held a pretrial hearing pursuant to section

115-10(b)(1) of the Code (*id.* § 115-10(b)(1)) to determine, in the words of the statute, whether

"the time, content, and circumstances of" the children's out-of-court statements "provide[d] sufficient safeguards of reliability."

¶ 15 At the hearing, the State first called Deuth, who testified that she was a forensic interviewer at the Carrie Lynn Children's Center in Rockford, Illinois, and that on May 1, 2023, she interviewed the children. The prosecutor showed Deuth People's exhibit No. 1, a thumb drive on which videos had been downloaded. Deuth's interviews of the children were not the only videos in People's exhibit No. 1. This exhibit also contained forensic interviews of the children by Emma Busken in DeKalb, Illinois, on February 2, 2022; interviews of Andria and her boyfriend, Tony Lagambina, by the DeKalb police on February 3, 2022; and an interview of Andria by Detective Rebecca Anderson of the Rockford Police Department on May 1, 2023. After Deuth authenticated the two videos in People's exhibit No. 1 that were of her interviewing the children, the prosecutor requested the admission of that exhibit. Defense counsel stated he had no objection. Therefore, the circuit court admitted People's exhibit No. 1 and ruled that it might be published.

¶ 16 The State next called Sharp, who testified she was a pediatric nurse practitioner and that on March 14, 2022, she performed head-to-toe physical examinations of the children, who had been "referred for suspected sexual abuse". As Sharp was physically examining A.M.O., she told Sharp that, at night, while her mother was sleeping, "[defendant] *** touched her private part and that it hurt" afterward when she went to the bathroom. A.M.O. further said she had seen defendant touch her sister, A.L.O. Likewise, when Sharp was physically examining A.L.O., she told Sharp that, at night, "once he knew mom was snoring," "[defendant] *** touched her private part," "the part she pees from." He did this touching "with his hand," and A.L.O. had seen him touch A.M.O., too.

¶ 17    The final witness the State called at the pretrial hearing was Andria, who testified substantially as follows. On December 23, 2021, she and the children were living at her mother's house in Sycamore, Illinois. From 2019 to 2021, they lived with defendant, but less than two weeks before December 23, 2021, they stopped living with him and moved in with Andria's mother. The morning of December 23, 2021, while they were staying at the Sycamore residence, A.M.O. revealed to Andria that defendant had "touched her inappropriately." Specifically, "[s]he said that he would *** put his fingers and insert them in her when [Andria] was sleeping, sometimes before work, sometimes in the middle of the night." A.M.O. made this revelation to Andria in the children's bedroom, in the presence of A.L.O. The prosecutor and Andria had the following further discussion about the touching as A.M.O. had described it to Andria:

"Q. Did she tell you where he would insert his fingers?

A. Yes, in her vagina.

Q. Did she use the word 'vagina,' or did she use a different word?

A. Yes. I—yeah.

Q. And did she say what it felt like when that happened?

A. Yes, she said it hurt."

A.M.O. told Andria it had happened "over 30 times." Nevertheless, Andria had seen no signs of abuse, although the children "did get [urinary tract infections] a lot *** within that time frame." A.M.O. was unable to tell Andria the years when the abuse happened, but she could recall the locations where it had happened. It had happened in the places where Andria and the children lived with defendant from 2019 to 2021: in DeKalb, on 7th Avenue in Rockford, and on Indiana Avenue in Rockford. Upon learning of the sexual abuse, Andria telephoned the police in Sycamore. The police in Sycamore, however, told her to go to the police station in DeKalb and

make a report there "because it started in DeKalb." Accordingly, Andria took the children to the DeKalb Police Department that same day, and A.M.O. "disclosed more when [they] got there."

¶ 18    On cross-examination, defense counsel explored with Andria the question of whom A.M.O. told first:

"Q. *** [W]hen your daughters first disclosed, they didn't disclose to you first; is that correct?

A. Correct. Well, they told me, yeah.

Q. Okay, but—in reference to the girls disclosing, at the time you were dating a 'Tony'; is that correct.

A. Uh-huh (affirmative), he was my friend at the time, yes.

Q. Your friend. What was your friend's last name?

A. Lagambina.

* * *

Q. And it's correct that when you spoke to police, you indicated that Tony—they told Tony first; is that correct, and then Tony told you?

A. No, that's not how it happened."

¶ 19    3. *The Interviews in People's Exhibit No. 1*

¶ 20    a. Forensic Interviews of the Children by Busken in DeKalb

¶ 21    i. *Busken's Interview of A.L.O.*

¶ 22    On February 1, 2022, in DeKalb, Busken interviewed A.L.O. In this interview, A.L.O. told Busken that, at night, defendant had done "bad stuff with his mouth," "touch[ing] something in front." Defendant, however, no longer lived with A.M.O. and her mother and sister. A man named Tony lived with them now, and Tony was "really nice" and "doesn't do anything

bad." "Mom thought [defendant] was a good guy," A.L.O. remarked, "but he isn't." A.L.O. told Busken that, at first, she said that defendant had touched her three times in this bad way, but that, later, she revised her estimate to six times. This touching of her private parts by defendant happened in the living room in Rockford, while her mother and sister were sleeping, but it did not always happen in the living room. A.L.O. said he also touched her with his fingers when her mother and sister were in the room, sleeping, and that his finger went inside her body. Busken asked A.L.O. how that touching made her feel. She answered that it hurt and made her angry. When Busken asked her to tell how it hurt, she answered, "Mommy told me 'cause we had too much UTI from him." "What does that mean?" Busken asked. "He's been going too far," A.L.O. answered. "Tell me about going too far," Busken asked. A.L.O. shrugged. Busken asked if A.L.O. had told anyone other than her mother. She answered that she also had told Tony at her grandmother's house in Sycamore, where they moved after they stopped living with defendant. She had never told anyone at school.

¶ 23    A.L.O. remarked that defendant had "lied to Mom." "He lied to Mom about what?" Busken asked. A.L.O. answered, " 'What are they learning in school?' That's what he said." She recounted, "Mom was talking to Tony, and I heard, and [defendant] has probably six sisters, and he did that which he just did to me."

¶ 24                                   ii. *Busken's Interview of A.M.O.*

¶ 25    Busken also interviewed A.M.O. on February 1, 2022. When asked why she was there, A.M.O. answered that she did not know. All she knew was that her mother had told her she had an appointment; she did not know what the appointment was for. A.M.O. now lived with her mother, her sister, Tony, and a cat, and she felt happy and safe at home. Someone whom her mother knew, defendant, had been "doing bad things to us," A.M.O. said, and by "us," she meant

herself and her sister. When they lived with defendant at Husky Ridge Apartments in DeKalb, defendant touched her private parts at night, both over her clothes and under her clothes, causing her to feel scared. Nobody else was in the room when he touched her. "He did that when we were sleeping," A.M.O. said, "and then that woke us up. That's how we know. It woke us up." "What did you know?" Busken asked. "We didn't know what he was doing to us," A.M.O. answered, "but we knew because we saw." He touched her "a lot" that way: "this many," A.M.O. said, spreading her arms wide—"I think 100." He always used his hand, going "inside," and it hurt. She had told only her mother about this touching, not Tony.

¶ 26    b. The Interview of Andria by the DeKalb Police

¶ 27    On February 3, 2022, an officer with the DeKalb Police Department interviewed Andria. She remarked, at the beginning of the interview, "It just hurts me that they didn't tell me." The officer asked, "When did you first find out about this?" She replied that she first found out on December 23, 2021, the same day she went to the police. The children revealed the sexual abuse to her boyfriend, Lagambina, at 7 a.m. that day. He was the first person whom they told. Andria woke up and noticed that the children were already awake and out of bed. Lagambina looked upset. He pulled Andria aside and told her, " 'I need to talk to you about what the girls just told me.' " After hearing from Lagambina, Andria went to the children and asked them, " 'Can you guys talk with me and tell me about what you and Tony just talked about?' " They asked, " 'Why did he tell you?' " Andria assured them she would not be upset and she only wanted to know if anyone had been hurting them. They then told her what defendant had done to them.

¶ 28    Specifically, the children told Andria that in Rockford, when Andria was "sleeping and snoring" and the children were cuddling together in the same bed in one of their

bedrooms, as they often did (although the children had separate bedrooms), defendant would enter the bedroom and lick his finger or have someone lick it for him and would touch them "down there," "on the inside." The children were "pretty vague," and, wary of influencing what they had to say, Andria did not want to "force anything out of them."

¶ 29　　　Andria had never noticed any injuries or bruises on the children. But they had kept getting urinary tract infections, for which she had taken them to the doctor some six times and had directed them to drink more water, which had not helped. Also, she had noticed changes in the children's behavior. They no longer wanted to hug defendant at night, and they began locking the bathroom door and expressing apprehension when they heard him coming upstairs as they were bathing.

¶ 30　　　Another troubling sign that Andria now recognized in retrospect was that when the children slept with her and defendant in the same bed, he "would sometimes insist on them sleeping in the middle"—"and now that sounds disgusting," Andria remarked.

¶ 31　　　Although defendant had not been informed specifically what the children had said about him, he knew he was suspected of sexually abusing them, for, the day when Andria found out, she "went crazy" and telephoned not only the police but also him. He responded to her, on the phone, " 'These are my babies. Why would you think I touched my kids?' " Andria surmised, "I'm sure he's scared because he touched his sisters, too." Andria told the officer that defendant had 12 siblings and that none of them would speak with defendant.

¶ 32　　　When Andria and the children lived with defendant (she continued in the interview), he installed surveillance cameras throughout the house, including in A.L.O.'s bedroom, but not in A.M.O.'s bedroom. The purpose of having a camera in A.L.O.'s bedroom was that, in a period when the children's behavior was bad, he could banish them to that

bedroom and make sure they stayed there and behaved. Andria noticed, however, that the cord to the camera in A.L.O.'s bedroom had been disconnected and was missing. When she asked defendant what had happened to the cord, he answered that he did not know. This was a bedroom where, A.L.O. subsequently told Andria, some of the sexual abuse had occurred. Whenever Andria and defendant got into an argument and she threatened to call the police, "he would get that big box thing that all the cameras connected to and hide it."

¶ 33               c. The Interview of Lagambina by the DeKalb Police

¶ 34          After interviewing Andria, the DeKalb police officer interviewed Lagambina. He said that, on December 23, 2021, while Andria was still asleep and he was getting the children up and ready, he had a conversation with them to the effect that they should be careful "not to get themselves in a bad situation." One of the children responded, " 'Yeah, that's what [defendant] used to do to us. He used to put his finger in his mouth.' " Lagambina asked them where Joe had put his finger. " 'In our private area,' " they answered, " 'down there.' " They said that when defendant touched them that way, it was always while their mother was snoring.

¶ 35         Later, when Lagambina and Andria were discussing what the children had disclosed, Andria recounted to him that defendant used to tell her he was unable to get to sleep until he heard her snoring. Given that recollection, Lagambina and Andria "put two and two together."

¶ 36         d. Subsequent Forensic Interviews of the Children by Deuth in Rockford

¶ 37               i. *Deuth's Interview of A.L.O.*

¶ 38         On May 1, 2023, in Rockford, Deuth interviewed A.L.O., who stated essentially as follows in answer to Deuth's questions.

¶ 39        A.L.O. was seven years old and in second grade. When asked what she had come to talk about, she answered, "The thing with [defendant]." Defendant was, A.L.O. explained, her mother's boyfriend and "was our dad once," and they used to live with him. Now A.L.O. lived with her mother, grandmother, and sister.

¶ 40        Deuth and A.L.O. had the following conversation about why they were there and whether A.L.O. had been instructed to say anything:

> "Q. What did Mom say about coming here to talk with me?
>
> A. I can't remember.
>
> Q. Did Mom tell you what you were supposed to talk about?
>
> A. Yeah, what he did to us.
>
> Q. Okay. What did she say?
>
> A. I don't remember. We were in a different town, and we had come here. We were in the car talking about it, and now I forgot. I forget very easily.
>
> Q. Did your mom tell you what you were supposed to tell me?
>
> A. Well, yeah, but then I forgot.
>
> Q. What did she tell you that you were supposed to tell me?
>
> A. She asked me to tell you that maybe he put something in, um, Mom, make, he gave Mom something to make her sleep.
>
> Q. Okay. How do you know that—that he gave Mom something to help her sleep?
>
> A. Well, I *think*.
>
> Q. How do you know that?

A. 'Cause every time we were sleeping, our mom was snoring really heavy and she was a heavy sleeper that day and I was trying to yell for Mom, but she couldn't hear me because he was covering my mouth."

¶ 41　　　　When Deuth asked A.L.O. to tell her more about that, she stated, "He always puts his finger in my private parts." She continued, "And he always makes sure that Mom is sleeping, and sometimes when he thinks she is about to wake up, he goes back to bed." This happened more than one time; it happened "a lot."

¶ 42　　　　Deuth asked A.L.O. where the private parts were. A.L.O. pointed to her crotch. When Deuth asked her what girls used their private parts for, A.L.O. answered that they used them to go to the bathroom and wipe. This was the part of her body that defendant had touched, and he had done so only with his hand, according to A.L.O., not with anything else. He "put it up in my clothes," she said, and it "hurt"—"he went up too far."

¶ 43　　　　A.L.O. thought that this touching happened in Rockford or DeKalb—she could not remember where. Later in the interview, however, she said it happened every day and "in every single house we moved in with him". A.L.O. was four or five when the touching began and six when the last touch happened.

¶ 44　　　　A.L.O. recounted that defendant touched her when she was sleeping in bed by herself, when she was sleeping in the same bed as A.M.O., and when she and A.M.O. were sleeping in the same bed as defendant and her mother. "He probably gave Mom something to not make her wake up," A.L.O. explained. Deuth asked her, "You said your Mom told you that?" "Uh-huh," A.L.O. answered. A.L.O. saw defendant touch her sister in the same way. She said, "When me and my sister were in bed together" (A.L.O. sometimes slept with her sister when A.L.O. was scared), "and then he would get out of his bed and then get into our bed and my

sister's bed and did that to her and did that to me." "The same time?" Deuth asked. "Uh-huh," A.L.O. answered. "And I think he would only lick his hand after that," A.L.O. added.

¶ 45        Deuth asked, "Did you ever tell your mom?" "I don't think so," A.L.O. answered, "but I was trying to wait for the good moment, but I guess that moment was, like, never happened." Eventually, though, "a long time ago," A.L.O. told her mother.

¶ 46        Defendant was not there when A.L.O. told her mother. Defendant and her mother "got into a lot of fights," A.L.O. recounted, and her mother "was done with him." The fights "were always different," and in one of the fights, A.L.O. was playing with her favorite toy, and defendant threw it. Because A.L.O. did not know where the toy went, she had felt sad and cried. A.L.O. never got hurt in any of the fights.

¶ 47        A.L.O. could not remember if anyone got hurt in the fights, but "they were really bad fights." She remembered:

> "One time, Mom tried to drive away to calm down, but he jumped in front of the car, and it seemed like she was about to run him over. But she actually wasn't, and she said to move out of the way, but he didn't, so she just stayed there. She had to."

A.L.O. and her sister were in the car at the time with their mother.

¶ 48                        ii. *Deuth's Interview of A.M.O.*

¶ 49        Deuth also interviewed A.M.O. on May 1, 2023. Here, essentially, is what she told Deuth.

¶ 50        A.M.O. was nine years old and in third grade. She lived with her grandmother, mother, seven-year-old sister, and six-month-old sister and did not know where her father lived or whether she had ever had any contact with him.

¶ 51    As with A.L.O., Deuth sought to find out whether A.M.O. knew why she was there to speak with Deuth:

> "Q. Well, so what did you come to talk to me about today?
>
> A. Um, I need my mom to help. I don't really know.
>
> Q. Well, what did Mom tell you about coming here today?
>
> A. About [defendant].
>
> Q. About [defendant]. Okay, and who is [defendant]?
>
> A. He's my mom's ex-husband.
>
> Q. And what did you come here to talk about [defendant] about?
>
> A. He was touching us.
>
> Q. He was touching you. And when you say 'us,' who was that?
>
> A. My sister and me.
>
> Q. What I would like you to do is tell me all about what happened to you."

¶ 52    The touching "hurt", A.M.O. recalled, and it happened both in her bed and in defendant and her mother's bed when A.M.O. and her sister slept with them. Deuth asked A.M.O. to talk about when it happened in her own bed. There were "cameras everywhere," A.M.O. said, and defendant turned them off at night when he "[came] in our bed" and then turned them back on in the morning. He touched "my private part," A.M.O. told Deuth. When Deuth asked her where on her body her "private part" was or if she had a name for that part, A.M.O. began weeping and answered, "Yeah, but I don't want to say it."

¶ 53    Before steering the conversation back to the subject of the touching, Deuth talked with A.M.O. about what her mother had asked her to tell Deuth:

"A. It was, like, well, my mom said to tell you that he put, like, something in her mouth to be sleeping.

Q. What do you mean? Tell me more about that.

A. I just don't know what it's called.

Q. What did it feel like?

A. It just felt bad.

Q. I just want to make sure I understand. What went in your mouth?

A. In my mom's mouth to keep her sleeping. So, she's a heavy sleeper when something's in her mouth. I just don't know...

Q. So, I just want to make sure I understand. Would Dad put something in your mom's mouth to keep her sleeping?

A. [Nods.]

Q. Would he put something in your mouth to keep you sleeping?

A. Our mom's.

Q. Just your mom's. And you know that because your mother told you?

A. [Nods.]

Q. Did you ever see that happen?

A. [Shakes her head.]"

¶ 54    Then the conversation returned to the subject of the nighttime touching:

"A. I was sleeping, and he woke me up.

Q. How would he wake you up?

A. He would just wake me up and start doing this stuff.

Q. What would he do first after he woke you up?

A. He went too far.

Q. Tell me about that.

A. Every time we move, he always does stuff like this, and it hurts so bad.

Q. Where in your body would it hurt?

A. In my front.

Q. And what do you use that part for, just to make sure I understand? I don't want to assume I understand what you're talking about.

A. To pee."

According to A.M.O., defendant not only used his index finger to touch the part that she peed from, but he "put his tongue in it," and her "mom didn't even know 'cause she was asleep—she was snoring."

¶ 55    Deuth and A.M.O. then had the following dialogue:

"Q. Was Mom sleeping in the same room you were in?

A. [Nods.] She didn't know.

Q. She didn't know, OK. Who else slept in that room?

A. Ex-husband.

Q. And then where would you sleep?

A. I used to sleep in our room, and then I slept in Mom's room, and this all happened."

¶ 56    The touching happened only in Rockford, A.M.O. said, and she probably was in first grade at that time. The part where she peed was the only part of her body that defendant touched, and he did not make her do anything with his body. "All he did," she said, was "put his finger up in it" after taking her pants and underwear off.

¶ 57 In response to the question of "Then what happened?" A.M.O. said, "I told Mom after we moved, and then we started talking about this to Mom." On the question of whether the touching had happened to anyone else, Deuth and A.M.O. had the following discussion:

"Q. Do you know if that happened to anybody else?

A. [Defendant's] sister.

Q. Who's [defendant's] sister?

A. They left in a fire, and they got all burnt.

Q. How do you know it happened to [defendant's] sister?

A. Because my mom told me."

A.M.O. had not seen defendant touching A.L.O. because A.M.O. was asleep when he did so. Nevertheless, "I know he touched her because she told me," A.M.O. said, "and he covered her mouth when she was crying." This touching also happened in their bedrooms: "He just did that same pattern again," as A.M.O. put it.

¶ 58 A.M.O. said that their mother was unaware of the touching because she was sleeping whenever it happened. The conversation returned to the subject of something having been put in her mother's mouth:

"Q. What was it that went in [your Mom's] mouth?

A. It was, like, I just don't know, but my mom told me it was, like, the sleeping pill."

Her mother had "said tell them about that."

¶ 59 Deuth and A.M.O. then had a discussion about whether there was anything else that A.M.O.'s mother had asked her to tell Deuth:

"Q. Did she tell you that there was anything else you should tell me today?

A. Tell you about everything that happened.

Q. Did she tell you what you should say?

A. [Nods.]

Q. Tell me more about that.

A. It happened in Rockford, and it happened every place we went.

Q. So, everything we talked about today, are they things you remember?

A. [Nods.]"

¶ 60　　　　Toward the end of the interview, Deuth asked A.M.O. if she had any questions for her. A.M.O. answered, "I'm trying to think 'cause my mom wants me to tell you everything that just happened so that you can detract [*sic*] him." (We are unsure, but it sounded as if A.M.O. said "detract.") The mother had told A.M.O. that " 'they're only here to help us.' "

¶ 61　　　　Deuth stepped out of the interview room to find out from her colleagues if they could think of anything else she should ask (as she explained to A.M.O. upon leaving the room). A.M.O. remained in the room, playing with toys, and the camera remained on. When Deuth returned, A.M.O. recounted a domestic disturbance. On one occasion, when they lived with defendant in a house, he began yelling at her mother (who did not yell back), and he threw everything, including A.L.O.'s yo-yo, into the backyard. Lots of police officers arrived—merely because of defendant's yelling, not because anyone had gotten hurt. Although A.M.O. and her sister were asked to sit in the squad car for a while, no one had to leave the home on that occasion. But A.M.O. and her sister wanted to leave "because of how he was treating us, how he was touching us."

¶ 62　　　　Then Deuth and A.M.O. had this final exchange about what her mother had known and what defendant had said:

"Q. Did Mom know about the touches when that happened?

A. [Shakes her head.] When he was at work, I was scared she was going to believe [defendant].

Q. What did [defendant] say about it?

A. We were making something at the same house. He said, 'What do these kids even learn there?' Because he was trying to lie.

Q. Did [defendant] ever tell you anything about telling? About telling about the touches?

A. He said, 'Do not tell your mom'—and I did.

Q. Did he say what would happen if you told your mom?

A. [Shrugs.] I don't think so."

¶ 63    e. The Interview of Andria by Anderson in Rockford

¶ 64    On April 4, 2023, Detective Anderson of the Rockford Police Department was assigned to this case after the DeKalb Police Department uncovered information about crimes that might have been committed in Rockford. On May 1, 2023, Anderson interviewed Andria, asking her, first, to clarify the different places where she had lived with defendant.

¶ 65    Andria said that, initially, she had her own apartment at Gideon Court in DeKalb. She and defendant decided to move elsewhere, however, because the rules of the apartment building permitted him to stay with her as a guest for only a few days at a time and "jumping around" became a hassle.

¶ 66    So, they moved into the basement of defendant's parents' house in Poplar Grove, Illinois, and lived there for a few months.

¶ 67 Next, they moved into Husky Ridge Apartments in DeKalb, where the children had their own bedroom, with a bunk bed, and defendant and Andria had their own bedroom. Because defendant and Andria had brought along all their belongings, however—the contents of two households—there was hardly enough space in the apartment, and they used their bedroom as a storage room and slept on a futon in the living room. Sometimes the children slept on the futon with them. It had never occurred to Andria that defendant might have been doing anything to the children.

¶ 68 Nevertheless, it seemed to Andria at the time that something strange was happening to her at Husky Ridge Apartments, and she could not determine the cause. She had always been a light sleeper and would be awakened by the creaking of a floorboard. At Husky Ridge Apartments, though, she began sinking into a deep sleep on the futon, and when she awakened, she felt lethargic and groggy, as if she had taken a sleeping pill. She felt sluggish and unrefreshed by sleep, and she could not figure out whether it was because she was dehydrated or perhaps anemic or whether it was because she was putting on weight. Even when she began exercising more, however, and eating better, the feeling of lethargy persisted.

¶ 69 About a year later, in October 2020, they moved from Husky Ridge Apartments in DeKalb to 7th Street in Rockford and lived on the second floor of a house converted into apartments. Their apartment had two bedrooms. The children shared a bedroom, and because parts to the bunk beds had been lost during the move, the bunk beds were converted into two separate beds for the children. Defendant and Andria had their own bedroom. They still had the futon, which they put in the living room.

¶ 70 In March 2021, they moved from 7th Avenue into a three-bedroom house on Indiana Avenue in Rockford. It was there that Andria began noticing "weird things going on

with" defendant. He installed surveillance cameras not only outside the house but also throughout the interior of the house. The cameras, which were activated by movement, communicated with an app on his and Andria's phones. What seemed to Andria, in retrospect, a "red flag" was that the cord to the camera in her youngest daughter's bedroom was missing. Also, she found it somewhat unnerving that, when she awoke in the morning, the green light of the camera in her and defendant's bedroom was on, indicating that while defendant was at work, he was watching her as she slept.

¶ 71        Andria described defendant as a "hacker," as technologically adept. He could remotely power off Andria's phone. Once, when she attempted to leave him, he powered off her phone, and she could not power it back on. Consequently, she was unable to use GPS to travel through Rockford and to her mother's house, and she had to return. Also, when she threatened to leave, he would smash her phone.

¶ 72        Eventually, Andria and the children were able to leave. They got in one of their two vehicles. Defendant positioned himself in front of the vehicle and clung to it, urging her not to go. She left him, telling him, "[W]e could not work it out," and she divorced him.

¶ 73        The house on Indiana Avenue in Rockford was the last place where Andria and the children lived with defendant. She and the children moved out of the Indiana Avenue house and into her mother's house, where the children disclosed the sexual abuse.

¶ 74        Andria learned from one of defendant's relatives, a woman named Elizabeth, that defendant "had touched on her little sister." Andria was going to meet with defendant's relatives to discuss these allegations of prior sexual abuse. The relatives got sick, however. Then, after they recovered from the sickness, they all died in a house fire, which was determined to be

accidental (although, by that time, defendant was aware of the children's allegations against him and Andria suspected him of having set the fire).

¶ 75                              4. *Arguments and the Ruling*

¶ 76         At the conclusion of the pretrial hearing pursuant to section 115-10(b)(1), the prosecutor requested an order allowing the State to introduce the children's statements to which Deuth, Sharp, and Andria had testified, for the statements, he argued, had "sufficient indicia of reliability." Deuth was a forensic interviewer trained to ask children open-ended questions instead of leading questions. The children's statements to Sharp "were made in the course of medical treatment" and "were specific." He also argued, "And in the case of the mother, this was the initial outcry on that date in December of 2021. The conversation with the mother was short, as she testified to, and then she went to the police station." Therefore, the prosecutor concluded, "all these statements are sufficiently reliable."

¶ 77         Defense counsel, on the other hand, objected to the proposed "admission of these hearsay statements." For three reasons, he disputed that the statements had sufficient indicia of reliability. First, he pointed out that A.M.O.'s disclosure to Andria "took place in both girls' bedroom," with A.L.O. listening. Second, neither of the children appeared to be upset when they made their statements to Sharp, even though, "this being of such a nature to be traumatizing, the girls should be upset." Third, defense counsel claimed that, when interviewing A.L.O., Deuth sometimes asked her leading questions.

¶ 78         After the attorneys made their arguments, the circuit court remarked that Deuth was a certified and qualified interviewer of children who was trained to ask nonleading questions and that the court had no reason to suppose she was biased or that she had testified untruthfully. The court likewise found that Sharp was a qualified nurse practitioner and that she was "the type

of witness [who would have] no particular bias." The court understood defense counsel's point "about the possibility of a different man living in the same home" and "the reason for raising that as a *** second potential perpetrator in the case." Andria, however, "had a conversation with the minor children on [December 23, 2021,] and then took them directly to the DeKalb County police station," and "she was doing the best she could at that point in time *** to protect her children." Therefore, the court granted the State's section 115-10 motion, ruling that if "both A.L.O. and A.M.O. are called to testify at trial, Joanna Deuth, Heather Sharp, and [Andria] can all be presented as witnesses."

¶ 79　　　　Defense counsel then pointed out to the circuit court that, before Deuth interviewed the children in Winnebago County, another forensic interviewer, Busken, interviewed them in DeKalb County and that there will "be some issues related to that prior interview of these children." Then there was the following dialogue between the court and defense counsel:

"THE COURT: Has [defendant] gone to trial in DeKalb County yet?

MR. GRANGER: Your Honor, that is done and over with, is resolved.

THE COURT: How was it resolved?

MR. GRANGER: There is not any charges any longer."

¶ 80　　　　　　　　　　　C. The Bench Trial

¶ 81　　　　　　　　　　　1. *The State's Case-in-Chief*

¶ 82　　　　A bench trial took place on September 24, 2024. In its case-in-chief, the State called six witnesses: Anderson, Andria, A.L.O., A.M.O., Sharp, and Deuth.

¶ 83　　　　　　　　　　　a. Anderson

¶ 84        Anderson testified she was a detective with the Rockford Police Department, had been employed there for 22 years, and, for the previous 10 years, had been assigned to the sensitive crimes unit, which investigated sexual assaults and crimes against minors. Since April 4, 2023, she had been assigned to this matter, which originated in DeKalb after the police there "uncovered some information that things had happened in Rockford."

¶ 85        Anderson had spoken with Detective Aaron Gates of the DeKalb Police Department and had reviewed the interviews of the children that took place in February 2022 in DeKalb. Nevertheless, after consulting with her multidisciplinary team, she had decided it would be "a good idea to do another follow-up interview" of the children. The purpose of further victim-sensitive interviews would be to "focus[ ] on incidents that occurred in Rockford," whereas the interviews in DeKalb had focused on incidents that had occurred in DeKalb. Accordingly, in May 2023, Deuth interviewed the children at the Carrie Lynn Children's Center in Rockford.

¶ 86                                b. Andria

¶ 87        Andria testified that she had three children: A.M.O., born in November 2013; A.L.O., born in July 2015; and a baby. From 2019 to 2022, she was married to defendant and lived with him first in DeKalb and then, from 2020 until December 3, 2021, in Rockford. The children also lived with them during that time, and the baby was born after the events in this case. On December 3, 2021, Andria and the children moved out of Rockford, away from defendant, and into Andria's mother's house in Sycamore.

¶ 88        The direct examination returned to the subject of where Andria and the children resided when they lived with defendant. They first occupied an apartment on 7th Avenue in

Rockford. It was a two-bedroom apartment on the upper floor of a house. The children shared one of the bedrooms, and Andria and defendant shared the other bedroom.

¶ 89         In early 2021, Andria, the children, and defendant moved from the 7th Avenue apartment into a house on Indiana Avenue in Rockford. In that house, the children each had their own bedroom, and Andria and defendant shared the third bedroom. Defendant installed video cameras not only outside the house but also inside: in the living room, dining room, the children's "room," and Andria and defendant's bedroom. "[W]e could watch things on our phone," Andria testified. She noticed that sometimes the cameras were disabled or unplugged.

¶ 90         The prosecutor had the following dialogue with Andria regarding an unplugged camera:

"Q. Tell us about that. Was that frequent or—

A. Yes, it was pretty often. I would ask the [children], and they—they didn't know where the cord was that would go into the wall.

Q. So, would you ask them about the cord because the cord was missing, or—

A. Yes, it was like a two-piece cord. It plugged in in the middle and then connected to the wall.

Q. Okay.

A. And like the camera was there, but the cord was frequently missing.

Q. Okay. Did you ever unplug them?

A. No.

Q. Did the [children] ever unplug them?

A. No."

¶ 91    On December 8, 2021, Andria and the children left the house on Indiana Avenue and moved to Sycamore, without defendant. Several weeks later, that same month, A.M.O. told Andria "something unexpected." The prosecutor and Andria had the following exchange about how A.M.O. made this disclosure:

"Q. Where were you when she told you something unexpected?

A. I was in my room, but I went in her room to talk because it sounded serious.

Q. So, how is it that you first heard of something in order to think it was serious and to go to her room?

A. Just her body language.

Q. Okay. Where were you when you decided to go to her room?

Q. Right by my door."

¶ 92    At the time of A.M.O.'s disclosure, Lagambina was at Andria's mother's house, visiting, and he, Andria, and A.L.O. were in A.M.O.'s bedroom. A.M.O. told Andria that defendant "did something to them, and she said that he had touched them inappropriately, and they said that he had touched them down there." Andria testified, "[T]hey didn't tell me too much before I decided to go to the police department," but, in that initial conversation, A.M.O. told her that the touching happened in "every place [they] had lived at with [defendant]" and that "it happened a lot," "in the middle of the night," while Andria "was sleeping". A.M.O. related that, in this inappropriate touching, defendant "used his fingers" and "his tongue" and that "it hurt." He was "30 or older," Andria testified.

¶ 93    On cross-examination, Andria denied that the children disclosed the sexual abuse to Lagambina first and that he in turn told her. She admitted, however, that, during the

approximately two years she was married to defendant, no sexual abuse was reported, even though she interacted with him and the children every day. She also agreed that, around December 2021, her relationship with defendant was deteriorating and they "were headed towards divorce" by then. She told the police in DeKalb, however, that she "had no sign or idea that any sexual abuse was going on." During their seven months of dating and two years of marriage, Andria never saw defendant behaving sexually toward the children. In fact, defense counsel asked Andria, "[A]t times, the [children] would share a bed with you and [defendant]; is that correct?" Andria answered, "It was rarely. It didn't happen all the time."

¶ 94    On redirect examination, the prosecutor asked Andria, "[W]hen the [children] would be sleeping in your bed, would you consider yourself a heavy sleeper or a light sleeper?" She answered, "A heavy sleeper." She denied that she always had been a heavy sleeper, but she testified that she was a heavy sleeper in Rockford—she did not know why.

¶ 95                                          c. A.L.O.

¶ 96    The State next called A.L.O., who testified that she was nine years old and in fourth grade. She lived in Sycamore but used to live in Rockford with her mother, A.M.O., and defendant. When asked, "Do you see [defendant] here today?" A.L.O. answered, "I don't know. I don't know," and, "I forgot what he looks like." She remembered talking with a woman at the Carrie Lynn Children's Center about things that happened when she lived in Rockford, but she could not remember what they had talked about. A.L.O. did not know if defendant moved with her and her family when they moved out of Rockford.

¶ 97                                          d. A.M.O.

¶ 98    A.M.O. was the next witness for the State. She testified that she was 10 years old and in fifth grade. She presently lived in Sycamore, but she used to live in Rockford with her

mother, her sister A.L.O., and defendant, to whom she referred as Joe. In court, she identified Joe as defendant, pointing him out. She remembered living in two different places in Rockford: in an apartment on 7th Avenue and in a white house on a street, the name of which she could not recall. In the 7th Avenue apartment, she shared a bedroom with her sister A.L.O., but in the white house, where she lived when she was in first grade, she had a bedroom of her own.

¶ 99        A.M.O. remembered telling her mother, after they moved from Rockford, about things that happened while they lived in Rockford. Specifically, she told her mother that defendant had been touching her "private," the part of her body for "[g]oing to the bathroom." "In [the] nighttime," in A.M.O.'s bedroom, he would touch her that way with "[h]is pointer finger and his tongue." None of the touching happened, however, in the 7th Avenue apartment, where A.M.O. shared a bedroom with A.L.O. Rather, the touching happened, "[m]ore than once," only in the other residence in Rockford. Defendant would take A.M.O.'s clothes off when he touched her, she testified.

¶ 100        On cross-examination, A.M.O. testified that, in the house in Rockford—as distinct from the 7th Avenue apartment—she would sometimes sleep in a bedroom with A.L.O. and that, "[q]uite a bit of time," she would share a bed with her mother, A.L.O., and defendant. She agreed that the 7th Avenue residence had cameras in all the rooms and the family dog liked to chew on cords. She did not know if she had told Tony about the touching, but Tony was present when she told her mother.

¶ 101        On redirect examination, the prosecutor asked A.M.O., "How come you didn't tell your mom about it while you were living with [defendant]?" "I don't know," she answered.

¶ 102                                        e. Sharp

¶ 103          Sharp testified that she was a pediatric nurse practitioner and that on March 14, 2022, she performed physical examinations of the children because it was suspected that they had been sexually abused.

¶ 104          In her physical examinations, Sharp found no abnormalities. Even so, Sharp explained, the absence of physical abnormalities was not necessarily inconsistent with the allegations of sexual abuse or the experience of pain when the abuse happened. The area of the vagina was pliable and, after being stretched, could return to normal without injury. In prepubescent girls, the area just inside the labia majora would be painful to the touch, and a penetration would not "necessarily have to cross through the hymen into the vaginal opening to cause that pain." Because the sexual abuse allegedly happened in the time frame of April 2019 to December 2021, when defendant lived with Andria and the children, Sharp would have "expect[ed] a normal exam" in March 2022, "based on the just female anatomy in general."

¶ 105          As Sharp was physically examining the children, they described to her the sexual abuse perpetrated upon them by defendant. The prosecutor and Sharp first discussed what A.M.O. had told her:

"Q. *** During your examination with [A.M.O.], did she disclose anything to you about sexual abuse?

A. Yes. [A.M.O.] had disclosed that [defendant] had touched her private part and it was painful, and she did have trouble going to bathroom afterwards. She explained this would happen at night once mom was sleeping.

Q. Did she identify her private part to you? Were you able to get more information about that?

- 28 -

A. She did. She identified her private part as the front part, and I had asked her if that was her vaginal area, and she said, yes, by pointing and nodding."

¶ 106    The prosecutor and Sharp also discussed what A.L.O. had told her:

"Q. And let's talk about [A.L.O.] When you were examining her, did [A.L.O.] disclose anything to you about sexual abuse?

A. Yes, [A.L.O.] had disclosed that [defendant] had touched her private part as well. It was during the night when mom was sleeping, and she would explain that he would wait until mom was snoring to touch her.

Q. Did she tell you where on her body that he would touch her?

A. She had identified her private part; what she said is the area she pees from.

Q. All right. And did she indicate whether or not she had seen [defendant] touch anyone else?

A. She had said that she had seen [defendant] touch [A.M.O.] as well."

¶ 107    On cross-examination, Sharp testified that, in A.M.O.'s account to her, "[t]here was no mention of licking her vagina or anything like that." Also, Sharp testified that, in her examination of A.M.O., she noted a prior history of sexual abuse. She specified, "My understanding was that *** there was a concern that [A.L.O.'s] father had sexually abused [A.M.O.]"

¶ 108                              f. Deuth

¶ 109    The State's final witness in the bench trial was Deuth. She described her training as a forensic interviewer of minors and how she went about interviewing minors who might have been sexually abused: she asked them nonleading questions and let them use their own words.

She identified, in People's exhibit No. 1, the videos of her interviews of the children that took place on May 1, 2023. People's exhibit No. 1 was admitted without objection. The State rested.

¶ 110                     2. *Defendant's Case*

¶ 111          After conferring with defense counsel and after the circuit court admonished him that he did not have to testify but that he was permitted to do so if he wished, defendant elected to testify. His testimony was substantially as follows.

¶ 112          Prior to 2019, he and Andria were dating, and in 2019, they lived in DeKalb. Even as early as 2019, in DeKalb, they got into arguments, and "the police were involved several times." By 2020, when they moved from DeKalb to Rockford, "[i]t was getting rougher," they "started arguing more," and "[e]verything started falling apart." Andria "constantly *** accused [him] of cheating at work," although he did not cheat on her, and he had "questions about her fidelity at the time"—but, unlike her, he did not give voice to his suspicions.

¶ 113          He worked 10-hour days at Rockford Processing Control, putting in overtime. Andria was not employed and stayed home and raised the children. When he came home from work and tried to relax, Andria would argue with him and get him "rile[d] up enough to where [he] would be yelling, and she would call the police." Whenever they argued, Andria would accuse him of sexually abusing the children. She made this accusation to him "because she knew it got underneath [his] skin." He testified, "Every time the police were involved"—which was some "two or three" times—the Illinois Department of Children and Family Services (DCFS) would arrive, and Andria, A.M.O., A.L.O., and defendant would each speak with DCFS.

¶ 114          Around 2020, as their relationship became more acrimonious, Andria threatened defendant that she would report to the authorities that he had been sexually abusing the children. On that subject, defense counsel and defendant had the following dialogue:

"Q. And with the decline of your relationship with the fights, were threats made by [Andria]?

A. Yes.

Q. Okay. And is it fair to say that the threats were allegations of this nature?

A. Yes.

Q. And how many times do you think she would threaten you?

A. About every time we argued, about two or three times a month.

* * *

Q. In spite of the fact that she would make those threats, it's correct that during the course of your relationship while you were living together, it was never stated to the police; is that correct?

A. Yes."

¶ 115    Although the four of them—Andria, defendant, and the children—"shared a bed" with "[m]oderate frequen[cy]," defendant denied ever touching the children or unclothing them. He characterized Andria as "a pretty light sleeper," and he had rarely been alone with the children.

¶ 116    It was defendant who finally ended his and Andria's relationship. He had the police remove her from the residence, and because she was so argumentative, he would not allow her back into the residence, not even to pick up her belongings.

¶ 117    At the conclusion of the bench trial, the circuit court found defendant guilty of three counts of predatory criminal sexual assault of a child and sentenced him to three terms of natural life imprisonment.

¶ 118     This appeal followed.

¶ 119                    II. ANALYSIS

¶ 120               A. Forfeiture of the Hearsay Issue

¶ 121     Except insomuch as a statute or a rule of the supreme court provides otherwise, hearsay is inadmissible. Ill. R. Evid. 802 (eff. Jan. 1, 2011). " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). In that definition of hearsay, the term " 'statement' " means an "assertion"—either oral, written, or intentionally implied by conduct (Ill. R. Evid. 801(a) (eff. Oct. 15, 2015))—and the term " 'declarant' " means the person who made the statement (Ill. R. Evid. 801(b) (eff. Oct. 15, 2015)). Thus, if, other than while testifying at the trial or hearing, *A* stated, "*B* abused me," the statement would be hearsay if, at the trial or hearing, the statement were offered in evidence to prove that *B* abused *A*. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). As hearsay, the statement would be inadmissible unless a rule of the supreme court or a statute made the statement admissible. See Ill. R. Evid. 802 (eff. Jan. 1, 2011).

¶ 122     Section 115-10 of the Code (725 ILCS 5/115-10 (West 2024)) creates exceptions to the ban on hearsay evidence. One of the exceptions applies to "a prosecution for a *** sexual act perpetrated upon or against a child under the age of 13." *Id.* § 115-10(a). Subsections (a)(1) and (2) of section 115-10 provide that two kinds of "testimony," though hearsay, "shall be admitted" under this exception:

          "(1) testimony by the victim of an out of court statement made by the

          victim that he or she complained of such act to another; and

(2) testimony of an out of court statement made by the victim describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual or physical act against that victim." *Id.* § 115-10(a)(1)-(2).

So, if *A* testifies, "I told *C*, '*B* abused me,' " *A*'s testimony would potentially be admissible even if its purpose were to prove the truth of the out-of-court statement it recounts (that *B* abused *A*), making the statement hearsay. See *id.* § 115-10(a)(1). Likewise, if *C* testifies, "*A* told me, '*B* abused me,' " *C*'s testimony would potentially be admissible even if its purpose were to prove the truth of the out-of-court statement it recounts (that *B* abused *A*), making the statement hearsay. See *id.* § 115-10(a)(2).

¶ 123        We say "potentially" because subsection (b) imposes conditions for the admission of such testimony containing hearsay:

"(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child *** either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement; and

(3) In a case involving an offense perpetrated against a child under the age of 13, the out of court statement was made before the victim attained 13 years of age or within 3 months after the commission of the

- 33 -

offense, whichever occurs later, but the statement may be admitted regardless of the age of the victim at the time of the proceeding." *Id.* § 115-10(b).

¶ 124    Defendant notes, "The [circuit] court allowed the state to admit [at trial] three purported statements of both [A.M.O.] and [A.L.O.] [Citation.] The statements were purportedly made to their mother, a nurse [(Sharp)], and a forensic interviewer [(Deuth)]." In their out-of-court statements, the children asserted that defendant had touched them sexually. The State's purpose in offering the children's out-of-court statements at trial, via the testimony of the mother, Sharp, and Deuth, was to prove the truth of what the statements asserted: that defendant had touched the children sexually. Therefore, the out-of-court statements by the children were hearsay. See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); 725 ILCS 5/115-10(a)(1), (2) (West 2024). Defendant contends that a statutory condition for the admission of this hearsay was unfulfilled, namely, that "the time, content, and circumstances of the statement[s] provide[d] sufficient safeguards of reliability." 725 ILCS 5/115-10(b)(1) (West 2024).

¶ 125    Defendant "acknowledges," however, "that counsel failed to object to the admission of the hearsay statements at trial and therefore forfeited the issue on appeal." In its brief, the State agrees with defendant's acknowledgment of forfeiture.

¶ 126    In conceding the procedural forfeiture, defendant is correct. To preserve for appeal the issue of whether the circuit court erred by admitting hearsay, defendant not only had to make a hearsay objection at trial, but he had to assert, in a posttrial motion, that the court had erred by overruling the hearsay objection. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Walker*, 255 Ill. App. 3d 10, 19-20 (1993). Although, at the pretrial hearing that the court held pursuant to section 115-10(b)(1), defense counsel objected to the children's hearsay

- 34 -

statements, he did not make hearsay objections to the statements when the State offered them in evidence at trial, nor did he claim, in the posttrial motion, that the statements were inadmissible hearsay. Because defendant (through his defense counsel) failed to take the preservative measures that *Enoch* requires, the issue of whether the children's out-of-court statements were inadmissible hearsay is forfeited. See *Enoch*, 122 Ill. 2d at 186; *Walker*, 255 Ill. App. 3d at 19-20.

¶ 127                B. Purported Ineffective Assistance by Causing the Forfeiture

¶ 128          Even though the issue of whether the children's out-of-court statements were inadmissible hearsay is forfeited, defendant has not forfeited a claim that defense counsel rendered ineffective assistance by causing the forfeiture—and defendant now makes that claim, on appeal. See *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 26 ("The ineffectiveness of trial counsel may properly be raised for the first time on appeal."); *People v. Watson*, 2012 IL App (2d) 091328, ¶ 21 ("A defendant may raise an ineffective-assistance claim on direct appeal when the basis of the claim can be ascertained from the record.").

¶ 129          Under the sixth amendment to the United States Constitution (U.S. Const., amend. VI), a criminal defendant has the right to counsel. This right to counsel includes the right to effective—which is to say, adequate or competent—representation by counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *People v. Boose*, 2025 IL App (4th) 231467, ¶ 30; *People v. Olsen*, 2023 IL App (4th) 220738-U, ¶ 32.

¶ 130          "The remedy for a valid claim of ineffective assistance of counsel should be tailored to the injury from the constitutional violation and should not unnecessarily infringe on competing interests." *People v. Patrick*, 2011 IL 111666, ¶ 35. The remedy that defendant seeks is a new trial, which is a recognized remedy for ineffective assistance (see *id.*).

¶ 131    To obtain that remedy, defendant must carry his burden of showing ineffective assistance. See *People v. Haynes*, 2024 IL 129795, ¶ 37. We decide *de novo* whether he has carried that burden. See *Jefferson*, 2021 IL App (2d) 190179, ¶ 26. (Necessarily, our standard of review is *de novo*. It would be impossible to be deferential toward the circuit court's decision on the ineffectiveness claim, for there was no decision by the circuit court on the ineffectiveness claim. Rather, defendant raises the claim, for the first time, on appeal.)

¶ 132    To carry his burden of showing he received ineffective assistance from defense counsel, defendant must establish two propositions: first, "the identified acts or omissions" by counsel "were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Second, the professionally unreasonable performance caused prejudice to the defense (see *id.* at 693). Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 133    Defendant argues that, for two reasons, no reasonable defense counsel would have allowed the section 115-10 issue to be procedurally forfeited. First, according to defendant, the children's statements to Sharp and Deuth failed to satisfy the criteria of admissibility in section 115-10(b)(1) because "the state failed to present any facts about a prior forensic interview done before those statements"—by which defendant means Busken's interviews of the children on February 1, 2022. Second, defendant contends that, regardless of Busken's prior interviews of the children, the out-of-court statements by the children "lacked sufficient safeguards of reliability." See 725 ILCS 5/115-10(b)(1) (West 2024) We will consider those two contentions one at a time.

¶ 134    1. *The Lack of Testimony Regarding Busken's Interviews of the Children*

¶ 135        On the authority of *People v. Zwart*, 151 Ill. 2d 37 (1992), and *People v. Simpkins*, 297 Ill. App. 3d 669 (1998), defendant argues that because the State "failed to present any information related to the substance" of the February 2022 interviews of the children by Busken—"no testimony or exhibit describing what occurred during the February interview: no information about the questions posed, the manner in which they were asked, or the children's responses"—the statements the children made after Busken's interview of them lacked " 'sufficient safeguards of reliability' " (quoting 725 ILCS 5/115-10(b)(1) (West 2024)).

¶ 136        That argument requires an understanding of *Zwart* and *Simpkins*. Therefore, we proceed to a discussion of those two cases.

¶ 137        In *Zwart*, at a bench trial, the circuit court found the defendant guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, ¶¶ 12-14) and sentenced him to imprisonment. *Zwart*, 151 Ill. 2d at 38. On appeal, Zwart contended that, at a pretrial hearing pursuant to section 115-10(b)(1), the court erred by overruling his attorney's hearsay objection to statements the three-year-old victim made to her mother on July 1 and 14, 1988. *Id.* at 43. The supreme court agreed that the circuit court had abused its discretion by admitting the victim's hearsay statements to the mother. *Id.* at 44.

¶ 138        The victim's delay in making her first statement to her mother—"approximately five weeks after the abuse occurred"—and her initial denial of abuse were troubling to the supreme court. *Id.* at 45. The supreme court noted, however, that, "as a general rule, delay in reporting abuse or initial denials of abuse will not automatically render a victim's statements inadmissible under section 115-10." *Id.* at 46.

¶ 139        The circumstances surrounding the victim's statements to her mother were more problematic to the supreme court. See *id.* at 44. On June 27 and 30, 1988 (*id.* at 40), before

making her statements to her mother implicating the defendant, "the victim was interviewed by at least three persons respecting the alleged sexual abuse (*i.e.*, a Park Forest police officer, a DCFS worker and a counselor at Mount Sinai Hospital)," and "[t]he State failed to introduce *any* evidence regarding the substance of" those prior interviews (emphasis in original) (*id.* at 44). The supreme court observed that, "[w]ithout such evidence, it was impossible for the trial court to determine whether the victim was questioned in a suggestive manner or was encouraged to accuse the defendant of sexual abuse." *Id.* at 44-45. As the proponent of the victim's statements to her mother, the State had "the burden of establishing that the statements were reliable and not the result of adult prompting or manipulation." *Id.* at 45. "A trial court should not presume from a silent record that suggestive interview techniques were not used." *Id.* Absent evidence of the substance of the interviews preceding the victim's statements to her mother, "the State failed to demonstrate that the circumstances surrounding the victim's statements support the reliability of those statements, as required by section 115-10" (*id.*), and the circuit court, therefore, abused its discretion by admitting the statements under the hearsay exception in section 115-10 (*id.* at 44).

¶ 140       On the authority of *Zwart*, the Fourth District held, in *Simpkins*, 297 Ill. App. 3d at 676, that the circuit court had erred by admitting a hearsay statement pursuant to section 115-10. In *Simpkins*, a child protective services investigator with DCFS, Mel Devall, interviewed six-year-old K.S. at her grade school regarding allegations that the defendant had (1) physically abused K.S. and her siblings and (2) sexually abused an older sibling, D.D. *Id.* at 671. In the interview at the school, K.S. divulged to Devall that the defendant had touched her sexually. *Id.* at 672.

¶ 141   This interview at the school, however, was not the first time Devall interviewed K.S. See *id.* About a month earlier, he interviewed her regarding a report that a grandfather (as distinct from the defendant) had sexually abused D.D. *Id.*

¶ 142   On the basis of the second interview, the interview at the school, the State charged the defendant with aggravated criminal sexual assault of K.S. (see 720 ILCS 5/12-14(b)(1) (West 1992)). *Simpkins*, 297 Ill. App. 3d at 671-72. Pursuant to section 115-10, the State filed a notice of intent to introduce into evidence at trial the statements K.S. made to Devall in that interview. *Id.* at 671. At the section 115-10 hearing, Devall acknowledged he could not specifically recall the questions he asked K.S. when he interviewed her a month before interviewing her at the school. *Id.* at 672. Nevertheless, the circuit court determined that the statements that K.S. made to Devall in the second interview were admissible under section 115-10. *Id.* at 673.

¶ 143   That determination was, the Fourth District held, an abuse of discretion (*id.* at 678-79) because, at the section 115-10 hearing, the State presented no evidence regarding the substance of Devall's first interview of K.S.—and, indeed, Devall acknowledged, at the hearing, that he was unable to recall the questions he asked K.S. in the first interview (*id.* at 676). The Fourth District reasoned as follows:

"Although the prior interview in this case dealt with allegations of sexual abuse of a sibling by someone other than defendant, without any evidence of the substance of that interview, it is impossible to determine to what extent Devall discussed the alleged sexual abuse by the grandfather or whether Devall questioned K.S. in a suggestive manner or somehow intimated that defendant was also a sexual abuser. See *Zwart*, 151 Ill. 2d at 45 *** ('A trial court should not presume from a silent record that suggestive interview techniques were not used.'). Evidence as to what

transpired during the prior interview was particularly important here because K.S.'[s] age made her susceptible to suggestion from outsiders." *Id.* at 677. The Fourth District interpreted *Zwart* as teaching that if the child were interviewed shortly before the interview that the State sought to have admitted under section 115-10, the State had to "affirmatively establish the content of the previous interview and *** affirmatively demonstrate that [the previous interview] did not compromise the reliability of the proffered statement." *Id.* If the State provided no evidence "regarding the substance and circumstances of the prior interview, the proffered statement should not be admitted unless other factors strongly suggest that the statement is reliable and not the result of suggestiveness by others." *Id.*

¶ 144    The State argues that *Zwart* and *Simpkins* are distinguishable from the present case because, "[a]s defendant concedes in his brief, the substance of the February 2022 interviews was admitted, without objection, at the pretrial hearing through People's Exhibit 1." To quote defendant's brief, People's exhibit No. 1, "admitted at the pretrial hearing, contained a flash drive with multiple videos," including "copies of forensic interviews conducted in February of 2022." In short, then, Busken's interviews of the children from February 2022 were video recorded, and those interviews were on the flash drive, People's exhibit No. 1, for the circuit court to view, along with all the other videos.

¶ 145    In his reply brief, defendant maintains, however, that "the mere presence of an interview on a flash drive does not establish the foundational facts required by section 115-10, and without evidence concerning the interview's substance and circumstances, the State failed to meet its burden to show that the later hearsay statements were trustworthy." The logic of this response is difficult to follow. The circuit court could view the videos of Busken interviewing the children, hear the questions she asked them, and thereby ascertain whether her questions

were leading or suggestive. Defendant argues, "No witness explained what questions were asked, whether the children were prompted, coached, or led, or whether the later statements to Sharp and Deuth were influenced by that interview." It is unclear, though, why such a witness would be needed when the court could see and hear for itself, by viewing the February 2022 videos, what questions were asked and whether the children were prompted, coached, or led. For that purpose, the videos of Busken's interviews surely were more reliable than a secondhand testimonial description of the interviews would have been. Because the February 2022 videos were in People's exhibit No. 1 for the court to view for itself, it would have been within "the wide range of reasonable professional assistance" for defense counsel to have regarded *Zwart* and *Simpkins* as inapplicable. *Strickland*, 466 U.S. at 689.

¶ 146 Defendant complains, however, that no foundation was laid for the admission of the February 2022 videos. The problem in *Zwart*, however, was not the lack of a foundation for the admission of the prior interviews. Rather, the problem in *Zwart* was that "[t]he State failed to introduce *any* evidence regarding the substance of" the prior interviews. (Emphasis in original.) *Zwart*, 151 Ill. 2d at 44. Likewise, the problem in *Simpkins* was not a lack of a foundation for the admission of the prior interview. Rather, the problem was the State's failure to present "any evidence of the substance of that interview." *Simpkins*, 297 Ill. App. 3d at 677. That problem does not exist in the present case. There could have been no better evidence of the substance of the interviews than accurate videos of the interviews. Therefore, *Zwart* and *Simpkins* are distinguishable.

¶ 147 Granted, as defendant points out, no foundation was laid in the pretrial hearing for the admission of the February 2022 videos. The purpose of a foundation would have been to prove that the videos were accurate portrayals of the interviews. See Ill. R. Evid. 901(b)(1), (9)

(eff. Sept. 17, 2019); *People v. Vaden*, 336 Ill. App. 3d 893, 899 (2003). To prove prejudice, however, from defense counsel's allowing a foundational objection to be forfeited (see *People v. DeHart*, 2025 IL App (4th) 231554-U, ¶ 103), defendant would have to show that, but for defense counsel's failure to make a foundational objection to the February 2022 videos, there would have been a reasonable probability of a different outcome in this case. See *Strickland*, 466 U.S. at 694. Defendant has not made such a showing. Generally, "errors in laying a foundation are easily cured" (internal quotation marks omitted) (*People v. Korzenewski*, 2012 IL App (4th) 101026, ¶ 7), and it seems likely that if defense counsel had insisted that the State lay a foundation for the February 2022 videos, the State could have done so.

¶ 148          2. *The Claim of Unreliability Apart From the Prior Interviews by Buskens*

¶ 149          Defendant contends that, regardless of any concerns about the February 2022 interviews, the out-of-court statements by the children lacked " 'sufficient safeguards of reliability' " (quoting 725 ILCS 5/115-10(b)(1) (West 2024)), and, therefore, defense counsel rendered ineffective assistance at trial by failing to make hearsay objections to the statements.

¶ 150          Most likely, though, if, at trial, defense counsel had made hearsay objections to the children's out-of-court statements, the circuit court would have overruled the objections, as it had done at the pretrial hearing. If history is a guide, the element of prejudice is problematic. "Under *Strickland*, a defendant alleging that his counsel was ineffective has the burden of showing both deficiency and prejudice." *People v. White*, 2025 IL App (4th) 230700, ¶ 59. Prejudice from the deficient performance is shown where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Id.* Because deficient performance and resulting prejudice are both essential elements of an ineffective assistance claim, we can bypass the question of whether

defense counsel's performance was deficient and proceed directly to the question of whether defendant has shown that the defense suffered prejudice from the lack of hearsay objections at trial. See *id.* ¶ 60.

¶ 151            The most reliable indication of how the circuit court would have ruled on hearsay objections if defense counsel had made them at trial was how the court ruled when, at the conclusion of the pretrial hearing, defense counsel made a hearsay objection to the children's out-of-court statements. At the hearing pursuant to section 115-10(b)(1), after admitting People's exhibit No. 1 and ruling that it could be published, the court overruled defense counsel's hearsay objection. There is no reasonable probability that the court would have ruled differently if, at trial, defense counsel had made the same hearsay objection as before.

¶ 152            To be sure, the State, like defendant, "has no entitlement to the luck of a lawless decisionmaker." *Strickland*, 466 U.S. at 695. Rather, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency." *Id.* Defendant contends that, for six reasons, it would not have been a reasonable application of section 115-10(b)(1) to overrule hearsay objections to the children's out-of-court statements if defense counsel had made such hearsay objections at trial but that, rather, the overruling of such objections would have been an abuse of discretion. See *People v. Sharp*, 391 Ill. App. 3d 947, 955 (2009) ("A reviewing court will reverse a trial court's determination pursuant to section 115-10 of the Code only when the record demonstrates that the court abused its discretion.").

¶ 153            First, according to defendant, "the record reflects direct evidence of coaching by the children's mother." He describes this evidence as follows:

"[A.L.O.] admitted during her forensic interview that her mother told her what to say, but that she 'forgot.' [Citation.] [A.M.O.] likewise explained that her mother told her to talk about 'Joe' and to say that he 'put something in her mouth for sleeping.' [Citation.] [A.M.O.] told the interviewer, when asked why she was there, 'I don't know, I need my mom to help me.' [Citation.] Both children described information they could only have learned from [Andria], such as claims that [defendant] had abused his sisters or 'went too far.' [Citations.] [A.L.O.] stated that she could not 'remember what [her] mom said' when asked why she was at the advocacy center talking to the interviewer, and told Ms. Deuth that her mom told her what to talk about, that they talked about it in the car, and that her mom told her what to tell but she forgot. [Citation.] *** [A.L.O.] stated that there were cameras in 'each angle of the room,' a turn of phrase different from the language that she uses through the rest of the interview."

Mostly what Andria had told the children to talk about, however, was speculation that seemed calculated to put her in a better light—*given* the children's own allegations that defendant had sexually assaulted them, sometimes in her immediate presence. She wanted the children to explain to Deuth that defendant must have put something in her mouth to cause her to sleep heavily (and that this postulated drugging was why she had failed to protect the children from their abuser). Granted, then, Andria coached the children in that respect, but she did not thereby coach them to accuse defendant, in the first place, of sexually touching them while she was scarcely an arm's length away.

¶ 154    The danger in coaching children, or in suggesting to them what to say, is that the "interviewer's words or procedures" will "move the child to imagine some event or some of its

- 44 -

details" and "the child will thereafter accept the fantasy as a memory." John R. Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash. L. Rev. 705, 710 (1987). In other words, children are "vulnerable to memory falsification through *** commonplace forms of suggestion." *Id.* A reasonable decision-maker could conclude, in this case, that the children's memories were uncorrupted. It could be argued that, generally, in Deuth's interviews of them, the children made clear distinctions between what they had experienced themselves and what they had heard from their mother: it was their mother who had said that defendant must have put something in her mouth, it was their mother who had said that defendant had sexually abused his sister, and it was their mother who said that defendant had given them urinary tract infections. The children were clear about that. Generally, in their conversations with Deuth, the children drew distinctions between the information that had come from their mother and the information that they themselves were providing, explicitly differentiating between the two types of information. The circuit court could have reasonably found that the children's basic allegations that defendant had touched them in their private parts with his finger and tongue were uncoached because Andria testified that, before the children made these allegations, it never occurred to her that defendant might have been sexually assaulting them. The court had the right to believe Andria in that respect and to disbelieve defendant when he testified that, every time he and Andria argued, she accused him of sexually abusing the children. See *People v. Embry*, 249 Ill. App. 3d 750, 766 (1993) ("A reviewing court cannot substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses."). For those reasons, we are unconvinced that it would be an abuse of discretion to find that the children's memories of the sexual assaults were unfalsified by coaching or suggestion by adults. See *Sharp*, 391 Ill. App. 3d at 955.

¶ 155 Second, defendant contends that "the circumstances of the disclosures contained inconsistencies and contradictions that further undermined their trustworthiness." On the one hand, in her statement to the DeKalb police, Andria said that the children had disclosed the abuse to Lagambina first and immediately afterward to her. On the other hand, in her testimony at the pretrial hearing and at trial, Andria denied that the children had disclosed the abuse to Lagambina first and insisted that, instead, they had disclosed it to her first. Likewise, A.M.O.'s testimony at trial differed, in some details, from her earlier statements. On the one hand, when Deuth was interviewing her, A.M.O. stated that the abuse "happened every place we went." On the other hand, in her testimony at trial, A.M.O. stated that the abuse happened only at the white house in Rockford and not at the 7th Avenue apartment. Also, on the one hand, when Deuth was interviewing her, A.M.O. stated that defendant abused her when she was sleeping in the same bed with him, her mother, and her sister. On the other hand, in her testimony at trial, A.M.O. stated that defendant abused her only in her bedroom and not in any other room of the house.

¶ 156 We agree with defendant that those are indeed discrepancies in the evidence. We disagree, however, that in every reasonable mind those discrepancies would necessarily undermine the trustworthiness of the earlier statements. A decision-maker could reasonably take the view, instead, that the earlier statements were trustworthy because they were closer in time to the events to which they related and that the discrepancies that emerged in the evidence at the pretrial hearing or at trial resulted from the fading of memories over time. In other words, the circuit court could have evaluated the trial testimony in the light of the earlier statements instead of the earlier statements in the light of the trial testimony.

¶ 157 Third, defendant argues that both the children and Andria had a motive to fabricate the allegations against him, considering that, on repeated occasions, he yelled at Andria

alarmingly enough that she felt the need to call the police; he threw and lost A.L.O.'s favorite toy, causing her to cry; and he stood in front of the vehicle and clung to it as Andria and the children attempted to leave him. Defendant cites *Simpkins*, 297 Ill. App. 3d at 676, for the proposition that a "[m]otive to fabricate, especially in custody or family-conflict settings, may undermine the trustworthiness of a child's hearsay."

¶ 158    That is a fair interpretation of *Simpkins*, but the operative word is "may," whereas we are looking for an abuse of discretion. See *Sharp*, 391 Ill. App. 3d at 955. The appellate court held, in *Simpkins*, that "the lack of motive to fabricate" was only one "factor[ ]" that was "important in making the reliability determination" (*Simpkins*, 297 Ill. App. 3d at 676), not that this factor was determinative or that the circuit court necessarily abused its discretion by finding that the child's statement was reliable despite the fact that the child and his or her parent had other reasons to be disaffected against the defendant.

¶ 159    Fourth, defendant claims that "the level of detail and apparent language used in the later statements raises additional concerns." He points out that "[t]he use of terminology beyond a child's developmental level can suggest adult prompting." One of the "factors" that are "important in making the reliability determination" is "use of terminology unexpected of a child of similar age." *Id.* In this regard, defendant maintains, "[A.L.O.'s] and [A.M.O.'s] use of terms like 'went too far' and their references to sleeping medication or that [defendant] 'put something' in their mother's mouth mirrored adult phrasing and things said by their mother rather than the natural vocabulary of six- and eight-year-olds."

¶ 160    Not every reasonable mind would necessarily be convinced that the phrase "went too far" is beyond the linguistic resources of a naturally speaking six- or eight-year-old. The phrase is made up of simple, single-syllable words, and it is a phrase that a young girl might use.

¶ 161    Admittedly, sleeping pills would be outside the experience of most young children, but A.M.O. told Deuth, "[*M*]*y mom told me* it was, like, the sleeping pill," and again A.M.O. told Deuth that her mother "*said tell them* about that." (Emphases added.) A.M.O.'s recounting to Deuth what her mother, Andria, said—and presenting it as something that Andria, as distinct from A.M.O., said—was merely accurate reporting of the facts, not a falsification of memory. It is not that, in this respect, A.M.O. presented her mother's words as her own words.

¶ 162    We grant that "vagina" is probably not a word that typical six- or eight-year-olds would use. Defendant argues that "[s]uch adult-influenced language further indicates contamination." But there could be an alternative explanation. It could be that, contrary to Andria's testimony at the pretrial hearing, the children never used the word "vagina," and by the time of the pretrial hearing, the passage of time had caused Andria to incorrectly remember the precise language the children used when they disclosed the abuse to her years before. Neither in Busken's interviews nor in Deuth's interviews did either of the children use the word "vagina." Therefore, arguably, it was unlikely they used that word when disclosing the abuse to their mother.

¶ 163    Fifth, defendant argues "there was no detail as to the spontaneity of the statements to Ms. Sharp," and he observes that A.L.O. never told Sharp that defendant had touched her private parts with his mouth. Among the factors a circuit court should consider when assessing the reliability of a child's out-of-court statement are "the child's spontaneity and consistent repetition of the incident." *Id.* The factor of spontaneity, however, is inapplicable to the children's statements to Sharp. That factor is more relevant to their original disclosure to Lambagina or their mother. Once they made their original disclosure, there inevitably would be, afterward, some degree of prompting, implied or explicit, for them to discuss the sexual abuse

further, and complete spontaneity would be gone. Sharp's very act of examining the children's genital areas already presupposed that the children might have been subjected to bad touching. Medical histories are typically not spontaneous. In examining the affected part, the doctor or nurse practitioner asks what happened. It does not follow that medical histories are unreliable due to a lack of spontaneity. Arguably, children, like adults, would understand that, for the nurse to be able to help them, they must be truthful about what happened. A six- or eight-year-old child probably would perceive that the nurse was trying to help her by looking for any injury—and that, in this endeavor, the child needed to help the nurse help her.

¶ 164    We take defendant's point that, in A.L.O.'s statement to Sharp, there was no consistent repetition by A.L.O. of her allegation that defendant had touched her private parts with his mouth. Even so, A.L.O. repeated other details: that defendant touched, with his fingers, the area she peed from; that he did so at night, while her mother was snoring; and that A.L.O. had seen defendant touch A.M.O., too. Therefore, we are unconvinced that, by finding that the children's statements to Sharp were sufficiently reliable, the circuit court abused its discretion. See *Sharp*, 391 Ill. App. 3d at 955.

¶ 165    Sixth, defendant argues that "the amount of time between the alleged abuse beginning and the disclosure indicates a lack of reliability." The supreme court has held, however, that, "as a general rule, delay in reporting abuse *** will not automatically render a victim's statements inadmissible under section 115-10." *Zwart*, 151 Ill. 2d at 46. The circuit court could have reasonably decided that the delay was outweighed by the repetition of details from Busken's interviews to Deuth's interviews. See *Simpkins*, 297 Ill. App. 3d at 676.

¶ 166    In sum, then, we find that there would have been no reasonable probability of a different outcome if, at trial, defense counsel had made hearsay objections to the children's

out-of-court statements. At the pretrial hearing pursuant to section 115-10(b)(1), the circuit court had already ruled that the statements were admissible under the statutory exception to the hearsay rule. The record appears to give no reason for supposing that the court would have ruled differently at trial. The ruling of admissibility under section 115-10 was not, for the State, "the luck of a lawless decisionmaker." *Strickland*, 466 U.S. at 695. In other words, we are unconvinced that the ruling was an abuse of discretion (see *Sharp*, 391 Ill. App. 3d at 955), or that it was an arbitrary ruling or one with which no reasonable person could agree (see *People v. Cook*, 2018 IL App (1st) 142134, ¶ 29).

¶ 167                                   III. CONCLUSION

¶ 168          For the reasons stated, we affirm the circuit court's judgment.

¶ 169          Affirmed.